UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| THE PINES CHURCH and MATT GIOIA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:23-cv-00214-LEW |
| | ) | |
| HERMON SCHOOL DEPARTMENT, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs The Pines Church and its lead pastor, Matt Gioia, looking for a new space to accommodate their growing congregation, requested a twelve-month lease to hold Sunday services at Hermon High School.  The Defendant Hermon School Department's School Committee, after meeting and discussing the challenges associated with such a relationship, did not make a motion to vote on the requested twelve-month lease. Furthermore, the Committee members refused to second a motion to vote on a six-month lease.  Ultimately, the Committee voted to offer Plaintiffs a month-to-month lease. Plaintiffs filed this civil action, alleging that the School Committee's refusal to extend a long-term lease was motivated by animus against their sincerely held religious views, in violation of the First Amendment of the United States Constitution and the Maine Human Rights Act.  The School Department offers a competing characterization of events,

maintaining that the School Committee's decision was influenced by concerns about entering into a long-term lease agreement.

Before the Court are the parties' competing motions for summary judgment. Mot. for Summ. J. (ECF No. 27) ("School Department's Motion"); Mot. for Summ. J. (ECF No. 29) ("Plaintiffs' Motion"). Plaintiffs rely on the relatively blatant bias and the inferences that arise from the interrogatories posed by one Committee member who demanded to know from Pastor Gioia the Church's "position" on a spate of religious, political, and cultural flashpoints before evaluating whether to extend a lease on behalf of a publicly funded school. Plaintiffs also rely on a somewhat more tepid bias, sanitized through fear-of-association comments by others, along the lines that association with the Church may not fit with the Committee's "goals" and may therefore create a "negative image" by not comporting with the School Department's "mission" and evidently its own beliefs. This evidence certainly is probative of Plaintiffs' position that the School Committee's refusal to offer Plaintiffs a lease was motivated by unconstitutional considerations, such as animus toward the Church's orthodox religious beliefs. For its part, the School Department counters that the School Committee's decision, save for the one Committee member's bill of particulars put to the Pastor, simply resulted from humdrum, benign space and cost concerns, although that narrative is far from conclusive based on the summary judgment record. These competing characterizations of the Committee's motivations form the most conspicuous reason I deny summary judgment to the parties in favor of a jury trial.

## BACKGROUND

The following facts are drawn from the record and are not in genuine dispute, except where indicated.[1]

In 2020, Matt Gioia and his family moved from Colorado to Hermon, Maine, and they established The Pines Church, a non-denominational Christian church that follows biblically orthodox Christian beliefs and practices.  Gioia serves as the Church's lead pastor.  In 2021, the Church began holding services at Spotlight Cinema in Orono, Maine.  The Church's membership quickly grew and was using over 70% of the available seating at the Cinema.  Thus, the Church began to consider renting space at larger venues, including the Hermon School Department's facilities.

External organizations can request to use the School Department's facilities.  Under the School Department's Policy KG, Community Use of School Facilities, "School facilities should be made available for appropriate community use when such facilities are not required for their primary purposes: the instruction of students and related school activities."  J.R. 408.  The "long-term rental or lease of unused school facilities shall be authorized by the Hermon School Committee upon the recommendation of the Superintendent of Schools."  *Id.*  An "occasional or short-term use of school facilities shall be authorized by the school principal subject to regulations established by the

---

[1] I have "evaluate[d] each motion independently." *Matusevich v. Middlesex Mut. Assur. Co.*, 782 F.3d 56, 59 (1st Cir. 2015).  The parties filed a Local Rule 56(h) Stipulated Record (ECF No. 26), and the statements of material facts for both Motions are similar.  Accordingly, these facts govern my analysis of both Motions; however, as noted below, the factual record concerning Plaintiffs' Motion contains more evidence about what was said during the School Committee's meeting on December 12, 2022, when the School Committee voted to offer Plaintiffs a month-to-month lease.

Superintendent." *Id.*  There is no written policy distinguishing between long- and short-term uses, though according to Hermon School Department Superintendent Micah Grant, anything less than one year is a short-term use, and anything longer than one year is a long-term use.  As the Superintendent, Grant is responsible for bringing long-term use proposals to the School Committee.

Organizations seeking to use the School Department's facilities and/or property must submit a Building/Facilities Request Form, which is then reviewed by school administrators.  *See* J.R. 407.  The primary consideration for approving or denying facility-use requests is whether the request would conflict with the school community's needs.  These requests are often granted by school administrators, but they are occasionally denied when space is not available.  The School Department has permitted organizations such as the Good News Club, the Builder's Club, the Hermon Cub Scouts, and the Girl Scouts to use the School Department's facilities for periods of three to nine months.[2]  The School Department has not leased any of its facilities or property over the past ten years.

---

[2] Plaintiffs characterize these organizations as having rented the School Department's facilities.  *See* Pls.' Mot. for Summ. J. at 3 (citing J.R. at 412–31).  The School Department qualifies this characterization, correctly observing that the documents cited by Plaintiffs demonstrate that the School Department approved the use of school facilities through the Building/Facilities Request Form and that those forms are not lease agreements.  Plaintiffs have not produced any evidence suggesting that the School Department has leased its facilities.

The parties dispute whether Mr. Richards Productions was permitted to use the School Department's facilities over a year.  Plaintiffs assert that the School Department permitted Mr. Richard Productions to utilize its facilities for a year and that Mr. Richard Productions used the facilities for a year.  See Pls.' Statement of Facts (ECF No. 30) at 2–3.  To support these assertions, the Plaintiffs cite a form titled "Community Use of School Facilities Waiver, Release and Agreement to Hold Harmless."  J.R. at 436.  The first sentence of this agreement reads, in part: "In consideration for being allowed to make use of facilities of the Hermon School Department for the period July 1, 2018, through June 30, 2019, the undersigned, for him/herself and the organization named below, hereby agrees to assume all risk of injury . . . ."  *Id.*  The School Department claims that Mr. Richard Productions only used some school facilities for a single day.  *See* Def.'s Opposing Statement of Facts ¶¶ 62–64 (ECF No. 31) (citing Grant Supp. Decl. ¶¶ 3–4 (ECF No. 31-1)).  In support, the School Department explains that Mr. Richard Productions'

In September 2022, Gioia contacted Superintendent Grant to discuss leasing space from the School Department.  Superintendent Grant was receptive to the Church's request, and he asked Gioia to submit a written proposal and give a presentation to the Hermon School Committee about the Church's vision for renting the School Department's facilities. Gioia submitted a written proposal to the Committee requesting a twelve-month lease of Hermon High School's cafeteria, theater, and two of its classrooms every Sunday from 7:00 a.m. to 1:00 p.m.  Grant's directive to Gioia to give a presentation to the Committee was novel.  Before this occasion, the School Department had not required people requesting to use school facilities through the Building/Facilities Request Form to make a presentation to the School Committee.

At the November 7, 2022, School Committee meeting, Gioia gave a presentation to the Committee.  To signify the Church's intent to invest in the Hermon community, Gioia offered to pay $1,000 per month, which was $400 more than the School Department's proposed monthly rent.

The following day, School Committee Member Chris McLaughlin emailed The Pines Church and explained that he had "a few follow-up questions for" Gioia "that occurred to [him] after the presentation."  J.R. at 283.  Gioia responded, asking that McLaughlin funnel his questions through Superintendent Grant.  *Id.* at 282.  McLaughlin emailed Superintendent Grant and wrote that he wanted to get a better sense of how the

---

Building/Facilities Request Form only requested to use the School Department's facilities on one day, July 27, 2019.  *Id.* ¶ 15 (citing J.R. at 434).  Attempting to controvert this statement, Plaintiffs once again point to the "Community Use of School Facilities Waiver, Release and Agreement to Hold Harmless" form.  This form, however, does not suggest that Mr. Richards Productions was permitted to use any of the school's facilities over an entire year.  Nor does it say anything about the nature or intensity of the use.

Church "approaches issues of diversity, equity, and inclusion" and "[the Church's] messaging around some key issues relevant to marginalized communities." *Id.* at 281. McLaughlin was "curious" about whether "the Pines Church" is "receptive of same-sex marriages?" *Id.* He asked if "they consider marriage only to be between 1 man and 1 woman?" *Id.* "In addition to" his "question on marriage," McLaughlin was "wondering if" Pastor Gioia "can share more information on where the Pines Church stands on" the following issues:

- "Access to safe and affordable abortion";

- "Access to gender affirming medical care";

- "Conversion therapy for LGBTQIA+ individuals (youths and adults)"; and

- "Inclusive sexual education and access to birth control for youth." *Id.*

On November 10, Superintendent Grant forwarded these questions to Pastor Gioia, who did not respond. *Id.* at 280. There is no evidence suggesting that other Committee members were involved in McLaughlin's inquiry or knew about it.

On December 12, 2022, the School Committee met to consider the Church's lease request. The parties offer competing narratives of what was said during this meeting.

Plaintiffs claim that one of the Committee members questioned how the lease would "fit" with the "Committee's 'goals'" and that Hermon High School Principal Brian Walsh and other Committee members commented that the School Department's association with the Church might create a negative image.[3]   Gioia Decl. ¶¶ 25–26 (ECF No. 29-1).

---

[3] The facts within this paragraph are disputed with respect to both Motions, though the record for Plaintiffs' Motion contains more evidence concerning what was said during the School Committee meeting. There,

According to Plaintiffs, Principal Walsh insinuated that the School Department could not associate themselves with the Church because its religious and political beliefs do not align with the School Department's mission and apparently its conflicting beliefs.  Lastly, Plaintiffs assert that the Superintendent and the Committee members did not identify any scheduling conflicts with Plaintiffs' requested lease.  The School Department refutes this description.

The parties agree that the Committee members discussed school-sponsored activities taking priority, space in the parking lot, and staffing issues, including the need to have the high school space cleaned on Sundays.

The Committee members did not move to vote on the request for a twelve-month lease.  Member Kristen Shorey moved to extend the Church a six-month lease, but none of the other Committee members seconded her motion.  Ultimately, Member Stephanie Oiler moved to offer the Church a month-to-month lease, and her motion passed with four members voting in favor, two abstaining, and one member, McLaughlin, voting against it.

The Church declined the proposed month-to-month lease.  In Pastor Gioia's view, a month-to-month lease does not provide the continuity necessary for the Church's community.

In May 2023, The Pines Church and Gioia filed this lawsuit against the Hermon School Department.  Plaintiffs' First Amended Complaint (ECF No. 10) asserts four counts

---

Plaintiffs rely upon Gioia's declaration as well as the minutes (which contain little detail about what was said) within the joint stipulated record, and the School Department relies upon Superintendent Grant's declaration and an attached transcript of the School Committee meeting.

against the School Department arising from the School Committee's refusal to offer Plaintiffs a long-term lease agreement.  In Count I, Plaintiffs allege that the School Department violated Plaintiffs' right to free exercise under the First and Fourteenth Amendments.  In Count II, Plaintiffs claim that the School Department violated the Maine Human Rights Act by denying Plaintiffs equal access to the high school space on account of Plaintiffs' religion.  In Count III, Plaintiffs claim that the School Department violated Plaintiffs' right to free speech under the First and Fourteenth Amendments by denying Plaintiffs access to a limited public forum because of their religious beliefs.  In Count IV, Plaintiffs assert that the School Department's refusal to offer them a year-long lease on account of their religious views violated the Establishment Clause of the First Amendment as it applies to the states through the Fourteenth Amendment.

Plaintiffs ask this Court for a declaratory judgment that the School Department: (1) violated Plaintiffs' right to free exercise; (2) violated Maine's public accommodation laws; (3) violated Plaintiffs' right to free speech; and (4) violated the Establishment Clause. Plaintiffs seek nominal damages and/or compensatory damages.  Plaintiffs also request an injunction requiring the School Department to provide Plaintiffs with either a six- or twelve-month lease.

## DISCUSSION

Parties "may move for summary judgment" and must "identif[y] each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Viscito*

*v. Nat'l Planning Corp.*, 34 F.4th 78, 83 (1st Cir. 2022) (quoting *Echevarría v. AstraZeneca Pharm. LP*, 856 F.3d 119, 126 (1st Cir. 2017)). A factual dispute is genuine "if 'the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.'" *Rodríguez-Cardi v. MMM Holdings*, *Inc.*, 936 F.3d 40, 47 (1st Cir. 2019) (quoting *Sánchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996)). A fact is material if it has "the 'potential to affect the outcome of the suit under the applicable law.'" *Id.* at 46 (quoting *Cherkaoui v. City of Quincy*, 877 F.3d 14, 23 (1st Cir. 2017)).

"Where, as here, the parties" both move "for summary judgment, the court must assay each motion 'separately, drawing inferences against each movant in turn.'" *Lawless v. Steward Health Care Sys.*, *LLC*, 894 F.3d 9, 21 (1st Cir. 2018) (quoting *E.E.O.C. v. Steamship Clerks Union*, 48 F.3d 594, 603 n.8 (1st Cir. 1995)). Once the moving party shows the absence of any disputed material fact, the non-moving party bears the burden of placing at least one material fact into dispute. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

My analysis of the parties' Motions proceeds as follows. First, I begin by analyzing the School Department's arguments for summary judgment on the three constitutional claims. The School Department argues that it is entitled to summary judgment because, in its view, there is no evidence in the record that the Committee turned down the Church's request for a lease because of its religion. In support, the School Department's evidence suggests that the Committee's decision was motivated by the attendant logistical concerns of entering into a twelve-month lease agreement. The record is hardly conclusive on this point. In any event, Plaintiffs have come forward with enough evidence suggesting that

bias infected the Committee's decisionmaking process, thereby precluding summary judgment for the School Department.   Second, I turn to the Plaintiffs' arguments for summary judgment on the constitutional claims.   Lacking any discussion about the requirements of municipal liability, the Motion fails to demonstrate that judgment as a matter of law is appropriate.   Furthermore, as with the School Department's Motion, there is a factual dispute as to whether the School Committee declined to offer Plaintiffs a lease for impermissible reasons.   Thus, Plaintiffs' bid for summary judgment rests on precedent applying a strict-scrutiny standard of review for claims under the Free Exercise Clause, and this bid for summary judgment falls short.   Finally, I turn to the parties' competing requests for summary judgment on the Maine Human Rights Act claim.   Summary judgment is similarly inappropriate because of the genuine dispute as to why the School Committee denied Plaintiffs a lease.

**A.     There is a Genuine Dispute as to Whether the School Committee Engaged in Biased Decisionmaking Based on Plaintiffs' Religious Beliefs, Precluding Summary Judgment for the School Department on the Constitutional Claims**

The parties' briefing focuses on the underlying constitutional claims and does not come within two zip codes of addressing the "additional requirements" for municipal liability under 42 U.S.C. § 1983.  *Freeman v. Town of Hudson*, 714 F.3d 29, 37 (1st Cir. 2013).   As such, their competing claims for summary judgment amount to all windup but no pitch.

Plaintiffs' constitutional claims are brought under § 1983, which "creates a private right of action for redressing abridgments or deprivations of federal constitutional rights." *McIntosh v. Antonino*, 71 F.3d 29, 33 (1st Cir. 1995).  "To prevail [under § 1983], a plaintiff

must show that 'the challenged conduct [is] attributable to a person acting under color of state law' and that 'the conduct must have worked a denial of rights secured by the Constitution or by federal law.'"  *Id.* (second alteration in original) (quoting *Soto v. Flores*, 103 F.3d 1056, 1061 (1st Cir. 1997)).

Municipalities are "person[s]" within the meaning of § 1983.  *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 688–90 (1978).  "Local governing bodies" "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief" when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Id.* at 689–90.  "A single decision by a municipal policymaker constitutes official policy 'only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'"  *Freeman*, 714 F.3d at 38 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)).  "Whether an official has this requisite level of specific policymaking authority is a matter of state law."  *Walden v. City of Providence, R.I.*, 596 F.3d 38, 56 (1st Cir. 2010).  Thus, courts "look to state law, including 'valid local ordinances and regulations,' for descriptions of the duties and obligations of putative policymakers in the relevant area at issue.'"  *Id.* (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 125 (1988) (plurality opinion)).  "Whether an official is a final policymaker is" "a question of law for the trial judge to decide."  *Id.* at 55.

In many § 1983 cases, "the constitutional deprivation is apparent on the face of the ordinance or in the text of the challenged municipal policy."  *Scott-Harris v. City of Fall River*, 134 F.3d 427, 436 (1st Cir. 1997), *rev'd sub nom. Bogan v. Scott-Harris*, 523 U.S.

44 (1998).[4]   But this case involves an "unusual twist" because resolving Plaintiffs' constitutional claims entails determining whether "the legislative body acted out of a constitutionally impermissible motive" by declining to offer Plaintiffs a long-term lease on account of their religious status.   *Id.*   Plaintiffs' claims arise from three different clauses of the First Amendment, as applied to the School Department through the Fourteenth Amendment.

First, the Free Exercise Clause of the First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise" of religion.   U.S. Const. amend. I. "The Free Exercise Clause 'protect[s] religious observers against unequal treatment'" and "inequality."[5]   *Church of Lukumi Babalu Aye*, *Inc. v. Hialeah*, 508 U.S. 520, 542 (1993) (alteration in original) (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 148 (1987) (Stevens, J., concurring in the judgment)).   When the government "den[ies] a generally available benefit solely on account of religious identity," it "imposes a penalty on the free exercise of religion that can be justified only by a state interest 'of the

---

[4] The United States Supreme Court reversed the First Circuit's holding in *Scott-Harris v. City of Fall River* that local officials sued in their individual capacity were not entitled to legislative immunity.   *See Bogan*, 523 U.S. at 46.   My discussion of the First Circuit's decision concerns its analysis of municipal liability, which the Supreme Court did not examine.

[5] The School Department argues that Plaintiffs have not demonstrated the requisite coercion to state a free exercise claim.   In support, the School Department cites *School District of Abington Township*, *Pennsylvania v. Schempp*, in which the Supreme Court explained that "it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion" because "a violation of the Free Exercise Clause is predicated on coercion."   374 U.S. 203, 223 (1963).   But if the School Committee declined to offer Plaintiffs a twelve-month lease because of Plaintiffs' religious affiliation, that would be coercive.   *See infra* at 23; *see also Carson v. Makin*, 596 U.S. 767, 778 (2022) ("The Free Exercise Clause of the First Amendment protects against 'indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.'" (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988))).

highest order.'"[6] *Trinity Lutheran Church of Columbia*, *Inc. v. Comer*, 582 U.S. 449, 458 (2017) (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978) (plurality opinion)).

Second, the Establishment Clause of the First Amendment forbids the government from making "law[s] respecting an establishment of religion." U.S. Const. amend. I. As explained by the Supreme Court, the "clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Trump v. Hawaii*, 585 U.S. 667, 699 (2018) (quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982)); *see also Marrero-Méndez v. Calixto-Rodríguez*, 830 F.3d 38, 44 (1st Cir. 2016).[7]

Third, the Free Speech Clause of the First Amendment prohibits the Government from "abridging the freedom of speech." U.S. Const. amend. I. Although "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities," *Cornelius v. NAACP Legal Def. & Educ. Fund*, *Inc.*, 473 U.S. 788, 799–800 (1985), the government "may not deny" individuals access to government property "on a basis that

---

[6] The School Department attempts to distinguish *Trinity Lutheran* and similar cases by arguing that Plaintiffs' requested lease cannot be categorized as a "generally available benefit." 582 U.S. at 458. But in cases involving the Free Exercise Clause, the Supreme Court has asked whether "the affected individuals [are] coerced by the Government's action into violating their religious beliefs" and whether "governmental action penalize[s] religious activity by denying [individuals] an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Lyng*, 485 U.S. at 449. Here, if Plaintiffs can prove that the School Committee refused to offer a long-term lease because of Plaintiffs' religious affiliation, that would be quite similar to the free exercise claim in *Trinity Lutheran*.

[7] Recently, the Supreme Court has instructed that the Establishment Clause "must be interpreted by 'reference to historical practices and understandings.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022) (quoting *Town of Greece*, *N.Y. v. Galloway*, 572 U.S. 565, 576 (2014)); *see also Shurtleff v. City of Bos.*, *Mass.*, 596 U.S. 243, 285–86 (2022) (Gorsuch, J., concurring) (identifying six "telling traits" of "founding-era religious establishments").

infringes [their] constitutionally protected interests—especially, [their] interest in freedom of speech," *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). The "extent to which the Government can control access [to its property] depends on the nature of the relevant forum." *Cornelius*, 473 U.S. at 800. Where, as here, the government has created a designated public forum, the government may impose "[r]easonable time, place and manner regulations," and "content-based prohibition[s] must be narrowly drawn to effectuate a compelling state interest."[8] *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) (citing *Widmar v. Vincent*, 454 U.S. 263, 269–70 (1981)). Furthermore, the School Department "may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum, nor may it discriminate against speech on the basis of its viewpoint." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (citations and internal quotation marks omitted)). Content discrimination "may be permissible if it preserves the purposes of" a limited forum, but "viewpoint discrimination" is "presumed impermissible when directed against speech otherwise within the forum's limitations." *Id.* at 830.

The common question within Plaintiffs' three constitutional claims concerns the requirement of government neutrality toward religion and whether the School Committee

---

[8] "The Supreme Court has distinguished several types of forums, including traditional public forums, designated public forums, and non-public forums." *Curnin v. Town of Egremont*, 510 F.3d 24, 28 (1st Cir. 2007). Because this case involves "public property which the state has opened for use by the public as a place for expressive activity," Plaintiffs' requested use of the School Department's facilities must be analyzed under the framework for designated public forums. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983); *see also Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988) ("Hence, school facilities may be deemed to be public forums only if school authorities have by policy or by practice opened those facilities for indiscriminate use by the general public, or by some segment of the public, such as student organizations." (citations and internal quotation marks omitted)).

refused to offer Plaintiffs a lease because of their religious views. *See Shurtleff v. City of Bos.*, *Mass.*, 596 U.S. 243, 261 (2022) (Kavanaugh, J., concurring) ("[A] government violates the Constitution when (as here) it *excludes* religious persons, organizations, or speech because of religion from public programs, benefits, facilities, and the like." (first citing *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020); then citing *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001); and then citing *McDaniel v. Paty*, 435 U.S. 618 (1978))). Whether the seven-member School Committee acted with an impermissible, anti-religious motive raises "perplexing problems of proof." *Scott-Harris*, 134 F.3d at 436. While the Committee members' alleged "bad motives may be proven by either direct or circumstantial evidence," it is unclear "[h]ow many municipal legislators (or, put another way, what percentage of the legislative body) must be spurred by a constitutionally impermissible motive before the [School Department] itself may be" liable under § 1983. *Id.* at 437.

The parties have not addressed this key issue. Fortunately, the First Circuit's decision in *Scott-Harris v. City of Fall River* offers guidance. There, the plaintiff sued the City of Fall River and others, alleging that the City Council's termination of her employment was retaliatory, in violation of her First Amendment rights. *Id.* at 431–32. On appeal, the First Circuit considered how a plaintiff can demonstrate that "the legislative body acted out of a constitutionally impermissible motive." *Id.* at 436. The Court observed that, "[o]n the one hand, because a municipal ordinance can become law only by a majority vote of the city council, there is a certain incongruity in allowing fewer than a majority of the council members to subject the city to liability under section 1983." *Id.* at 438. But

"[o]n the other hand, because discriminatory animus is insidious and a clever pretext can be hard to unmask, the law sometimes constructs procedural devices to ease a victim's burden of proof." *Id.* Having recognized these competing concerns, the First Circuit "eschew[ed] for the time being a bright-line rule" and

> assume[d] for argument's sake (but d[id] not decide) that in a sufficiently compelling case the requirement that the plaintiff prove bad motive on the part of a majority of the members of the legislative body might be relaxed and a proxy accepted instead. Nevertheless, any such relaxation would be contingent on the plaintiff mustering evidence of both (a) bad motive on the part of at least a significant bloc of legislators, and (b) circumstances suggesting the probable complicity of others.

*Id.*

The Court explained that "evidence of procedural anomalies, acquiesced in by a majority of the legislative body" or "evidence indicating that the legislators bowed to an impermissible community animus, most commonly manifested by an unusual level of constituent pressure, may warrant such an inference." *Id.* (first citing *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1121–25 (2d Cir. 1987); and then citing *United States v. City of Birmingham, Mich.*, 538 F. Supp. 819, 824–27 (E.D. Mich. 1982)). "The key is likelihood: Has the plaintiff proffered evidence, direct or circumstantial, which, when reasonable inferences are drawn in her favor, makes it appear more probable (i.e., more likely than not) that discrimination was the real reason" for governmental action? *Id.* Because Scott-Harris's evidence at trial suggested that no more than two of the nine city councilors may have acted with improper motives, the City of Fall River was entitled to judgment as a matter of law. *Id.* at 438–39.

In this case, the seven-member Hermon School Committee is the final policymaker. *See* 20-A M.R.S. § 1001(2) (providing that school committees "are responsible for the management of the schools and shall provide for their custody and care"); J.R. 408 (stating that the "long-term rental or lease of unused school facilities shall be authorized by the Hermon School Committee"). Accordingly, the Hermon School Department may be liable for its "decision[s] officially adopted and promulgated by" the School Committee. *Monell*, 436 U.S. at 690. Here, the propriety of § 1983 liability depends on examining whether the School Committee "acted [based on] a constitutionally impermissible motive" when declining to offer Plaintiffs a lease. *See Scott-Harris*, 134 F.3d at 436. Plaintiffs must establish that a majority of the School Committee refused to offer Plaintiffs a lease for improper reasons, though this standard could be relaxed if the Plaintiffs presented evidence of "(a) bad motive on the part of at least a significant bloc of legislators, and (b) circumstances suggesting the probable complicity of others." *Id.* at 438.

Evidently, the parties have conducted discovery and filed their competing Motions without considering exactly what must be proved under § 1983 to support a finding of unconstitutional municipal action. With the discovery process having closed in December 2023, the examination into the Committee members' subjective motives is over outside of calling them as witnesses at trial. Having not addressed the requirements of § 1983 and *Monell*, both parties' analyses regarding Plaintiffs' constitutional claims are incomplete and fatal to their attempts to resolve this case short of trial. Although this failure cuts against the Plaintiffs' Motion, *see Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403–05 (1997) (describing the plaintiff's burden to demonstrate that the

17

prerequisites to municipal liability are satisfied), it also cuts against the School Department's Motion.  While it is the Plaintiffs' burden to demonstrate municipal action, I conclude that the School Department has waived the *Monell* issue.  In its ten-page Motion, the School Department argues that "McLaughlin was only one of seven voting members of the Board and there is no evidence whatsoever to suggest that they based their decision on anything other than their longstanding practice of utilizing just school facilities for school sanctioned events."  Def.'s Mot. for Summ. J. at 9.  Having only "adverted to [the *Monell* issue] in a perfunctory manner" without "some effort at developed argumentation," the School Department has waived the issue for the purposes of summary judgment.  *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).  "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."  *Id.*

In any event, Plaintiffs have come forward with enough evidence such that the accompanying reasonable inferences yield a genuine factual dispute as to whether the School Committee's decision was based on an impermissible motive.  Plaintiffs' case does not solely rely on McLaughlin's questions, which, as the School Department conceded at oral argument, give rise to an issue of fact of whether McLaughlin had an improper motive.  Additionally, Plaintiffs assert that "one committee member said that leasing to the Church did not fit the Committee's goals," Pls.' Resp. to Def.'s Separate Statement of Material Facts ¶ 29 (ECF No. 43) (citing Gioia Decl. ¶ 25), and that Principal "Walsh even insinuated that" the School Department "could not associate themselves with the Church because their religious and political beliefs do not align with" the School Department's

"mission," *id.* (citing Gioia Decl. ¶ 27). Lastly, Plaintiffs claim that "[o]ther committee members and Principal Brian Walsh made discriminatory comments about the Church by suggesting" that the school's "association with the Church and its religious beliefs would create a negative public image." *Id.* (citing Gioia Decl. ¶ 26). Plaintiffs do not identify which School Committee members made these statements or how many School Committee members in total made similar statements, but at least three School Committee members are implicated.[9] This is just shy of a majority, but it suggests that "at least a significant bloc of" the Committee members may have acted with improper motives. *Scott-Harris*, 134 F.3d at 438. Furthermore, based on Plaintiffs' assertion that Walsh—the Principal of Hermon High School—made discriminatory comments by suggesting that associating the high school "with the Church and its religious beliefs would create a negative public

---

[9] These assertions from Gioia's affidavit—which parrot allegations from the First Amended Complaint—are somewhat vague but provide just enough detail to be worthy of consideration at summary judgment. *See Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 92 (1st Cir. 2018) (explaining that the plaintiff must provide "enough detail to allow a factfinder to potentially rule" in his or her favor).

 The School Department's proffered transcript of the meeting (which was offered in opposition to Plaintiffs' Motion, but not in support of the School Department's Motion) might corroborate Gioia's recount of the meeting. According to the transcript, McLaughlin asked how the lease "ties in with the [Committee's] goals" and how the lease would "bolster" the community. Grant Supp. Decl. Ex. A (ECF No. 31-2) at 4. Committee member Eva Benjamin asked whether the Church would "use the high school's address" to advertise and promote the Church, and after Superintendent Grant answered yes, she asked if "that would create any confusion or conflict in the community." *Id.* at 6. When asked about possible scheduling conflicts with school-related activities, Principal Walsh said: "If you put our high school's name with a church or another organization with different beliefs than the school has, I see that as a problem we're having." *Id.* at 7. McLaughlin asked Principal Walsh about whether students expressed any opinions about the lease, and Walsh responded that "a number of students" asked him "'Why would we have the church if we don't own that church? Are they going to use Herm[o]n High School's name? What if we disagree with their mission?'" *Id.* at 8. Committee Member Haily Keezer did not "see how them using the address so people can find it has anything to do with affiliation with the school," and she said, "So it sounds like what you're saying is, you don't want them to say, 'Herm[o]n High School.' You don't want them to associate with that." *Id.* at 9. Principal Walsh said that he did not "want it looking like Herm[on] High School is sponsoring a church. That's where—again—this is where the blur comes in. So again, that's something you guys ensure." *Id*

image," Pls.' Resp. to Def.'s Separate Statement of Material Facts ¶ 29, it is possible that other Committee members might have been influenced by Walsh's comments. *Cf. Scott-Harris*, 134 F.3d at 439 (emphasizing that "[n]one of the other seven city council members uttered any untoward statements"). Moreover, a jury could consider whether Plaintiffs are similarly situated to the organizations that use—but do not rent—school facilities in evaluating the veracity of the School Department's asserted reasons for declining to enter into a long-term lease with Plaintiffs. *See Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 87 (1st Cir. 2004) ("[S]uspicion arises where the viewpoint-neutral ground is not actually served very well by the specific governmental action at issue . . . .").

The School Department places great weight on the undisputed fact that the School Committee offered Plaintiffs a month-to-month lease.[10] From there, the School Department reasons that a jury could not find that the Committee's refusal to offer a lease was based on improper considerations since the Committee was willing to enter into a month-to-month lease agreement with Plaintiffs. In the context of the School Department's Motion, the record must be viewed in the light most favorable to the Plaintiffs' cause. A reasonable jury could find that the Committee's unwillingness to enter into a twelve-month lease agreement with Plaintiffs, evinced by none of the Committee members being willing to even second the motion to offer a six-month lease, was based on impermissible considerations, such as a fear of association, which Principal Walsh and other Committee

---

[10] The School Department argues that it is entitled to summary judgment on the free speech claim because Plaintiffs have not presented any evidence suggesting that the school administrators or Committee members knew of Plaintiffs' religious views. This argument overstates Plaintiffs' burden because the mere exclusion of the Church "based on its religious nature" would constitute "viewpoint discrimination." *Good News Club*, 533 U.S. at 107.

members allegedly expressed.  In short, whether the Committee members acted with improper motives when considering Plaintiffs' lease request remains in dispute, so the School Department's Motion is denied.[11]  I now turn to Plaintiffs' Motion.

**B.     This is Not a Case for Application of the Strict-Scrutiny Standard of Review, Precluding Summary Judgment for Plaintiffs on the Constitutional Claims**

Because Plaintiffs' Motion fails to brief the prerequisites of § 1983 liability, the Plaintiffs have not demonstrated that judgment as a matter of law is appropriate. Additionally, the factual dispute concerning bias similarly precludes Plaintiffs' bid for summary judgment because a reasonable jury could find that a significant bloc of the School Committee was not motivated by improper considerations.

Nonetheless, Plaintiffs contend that precedent concerning the Free Exercise Clause compels applying strict scrutiny and that they prevail under that heightened standard of review.  "A key issue with respect to" free exercise claims "is the appropriate standard of scrutiny." *Lowe v. Mills*, 68 F.4th 706, 714 (1st Cir. 2023).  Generally speaking, under the Free Exercise Clause, government action is either subject to a heightened degree of scrutiny, namely, strict scrutiny, or deferential review for a rational basis.  If strict scrutiny applies, the challenged governmental policy must advance "'interests of the highest order' and [be] narrowly tailored to achieve those interests." *Fulton v. City of Philadelphia, Pa.*, 593 U.S. 522, 541 (2021) (quoting *Lukumi*, 508 U.S. at 546).  Under rational-basis review,

---

[11] The School Department argues that it is entitled to summary judgment on the claims asserted by Gioia because he was acting on behalf of the Church.  Plaintiffs acknowledge that Gioia's claims are redundant and that he does not seek any relief separate from what is sought by the Church.  Because discrimination against the Church would likewise be discrimination against Gioia, Plaintiffs' request for summary judgment as to Gioia's claims fails.

the challenged governmental policy must be only "rationally related to a legitimate governmental interest." *Does 1-6 v. Mills*, 16 F.4th 20, 29 (1st Cir. 2021). In other words, when strict scrutiny applies, it is often possible for plaintiffs to win summary judgment, and when rational basis applies, defendants usually win.

Plaintiffs offer two theories in support of strict scrutiny. First, Plaintiffs argue that the School Department's "facility[-]use consideration practices are not neutral and generally applicable." Pls.' Mot. for Summ. J. at 8. Second, Plaintiffs argue that the School Department's refusal to extend Plaintiffs a lease has substantially burdened Plaintiffs' exercise of religion. Plaintiffs contend that both considerations independently require applying strict scrutiny.

Plaintiffs' first theory hinges on whether they are challenging a "law or policy 'incidentally burden[ing] free exercise rights.'" *Swartz v. Sylvester*, 53 F.4th 693, 700 (1st Cir. 2022) (quoting *Does 1–6*, 16 F.4th at 29). "[N]eutral and generally applicable" laws or policies that "incidentally burde[n] religion" are subject to rational-basis review. *Fulton*, 593 U.S. at 533 (citing *Emp. Div.*, *Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 878–82 (1990)). On the other hand, strict scrutiny applies to laws or policies that are "not neutral or generally applicable." *Swartz*, 53 F.4th at 700.

Plaintiffs' Motion does not specify what law or policy is incidentally burdening their religion. Rather, the Motion refers to the School Department's "facility[-]use consideration practices" at large. Pls.' Mot. for Summ. J. at 8. At oral argument, Plaintiffs' counsel disclaimed a challenge to Policy KG and stated that they were challenging two unwritten policies that were not facially neutral toward the Church or neutral as applied to the Church.

22

Plaintiffs' counsel explained that they were challenging the School Department's unwritten policies of not entering into one-year rental agreements and not renting to the Church longer than one month at a time.

Plaintiffs' attempt to turn the School Department's asserted justifications into unwritten policies subject to strict-scrutiny review is misguided.  Given the apparently conflicting rationales offered by the Committee members, Plaintiffs have not demonstrated that the School Department has adopted an unwritten policy against long-term lease agreements.  *See Hassan v. City of N.Y.*, 804 F.3d 277, 295 n.5 (3d Cir. 2015) (explaining that unwritten policies are subject to equal-protection challenges, but that it will be more difficult to establish the existence of an unwritten policy).  Even if the School Department had an unwritten policy against long-term rental agreements that interfered with Plaintiffs' right to free exercise, it would not have "coerced" Plaintiffs "into violating their religious beliefs" or "penalize[d] religious activity," so Plaintiffs' challenge would fail.  *Lyng*, 485 U.S. at 449.  Nothing in the Constitution prevents the School Department from deciding that they will not enter into any long-term lease agreements.  *See Bowen v. Roy*, 476 U.S. 693, 700 (1986) ("The Free Exercise Clause affords an individual protection from certain forms of governmental compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures.").  But once the School Department has opened itself up to possible lease agreements, it cannot turn a religious group away simply because of its religious character.  Thus, the question here is, as I have explained above, whether the Committee acted with improper motives when declining to extend Plaintiffs a

23

long-term lease agreement, thereby penalizing religious activity.  *See Trinity Lutheran*, 582 U.S. at 460 (discussing *Lyng*).

Plaintiffs' second argument in favor of strict scrutiny entails a clear misapplication of the substantial burden standard.   The Supreme Court has "never invalidated any governmental action on the basis of the [substantial burden] test except the denial of unemployment compensation."  *Smith*, 494 U.S. at 883–85; *see also Fulton*, 593 U.S. at 540–41 (declining to overrule *Smith*).  Plaintiffs' reliance on the First Circuit's decision in *Perrier-Bilbo v. United States* is off the mark because that case involved a claim under the Religious Freedom Restoration Act ("RFRA"), which only applies to the federal government.  954 F.3d 413, 431 (1st Cir. 2020); *see also City of Boerne v. Flores*, 521 U.S. 507, 511 (1997) (holding that Congress exceeded its authority under the Fourteenth Amendment by making RFRA applicable to the states).

Accordingly, I reject Plaintiffs' attempts to invoke strict scrutiny, and Plaintiffs' Motion is denied.  I now turn to the competing claims for summary judgment on the Maine Human Rights Act claim.

## C.   There is a Genuine Dispute as to Whether the School Committee Discriminated Against Plaintiffs' Access to a Place of Public Accommodation, Precluding Summary Judgment on the Maine Human Rights Act Claim

Under the Maine Human Rights Act ("MHRA"), "every individual" shall have "equal access to places of public accommodation without discrimination because of" protected traits, including "religion."  5 M.R.S. § 4591.  It is unlawful for any place of public accommodation, such as a school, *see id.* § 4553(8)(J), to "directly or indirectly refuse, discriminate against or in any manner withhold from or deny the full and equal

enjoyment to any person, on account of" protected traits, including "religion," *id.* § 4592(1).  Furthermore, public accommodations may not "discriminate against any person in the price, terms or conditions upon which access to accommodations, advantages, facilities, goods, services and privileges may depend." *Id.*

The parties disagree as to whether the School Department discriminated against the Church by declining to offer Plaintiffs a lease because of their religion.

For starters—as with the constitutional claims pursued under § 1983—the parties have not addressed the relevance of Plaintiffs' MHRA claim stemming from a decision by a multi-member council.  As a federal court exercising supplemental jurisdiction over Plaintiffs' MHRA claim, I must apply Maine's substantive law.  *Barton v. Clancy*, 632 F.3d 9, 17 (1st Cir. 2011).  Because the Maine Supreme Judicial Court (the "Law Court") has not spoken directly on that question, I must "predict 'how that court likely would decide the issue'" by considering reliable sources of authority, such as the statutory text and analogous decisions of the Law Court. *Id.* (quoting *González Figueroa v. J.C. Penney P.R., Inc.*, 568 F.3d 313, 318–19 (1st Cir. 2009)).

The Law Court's decision in *Walsh v. Town of Millinocket* may provide guidance as to how the Law Court would construe the MHRA in a case involving alleged discrimination by a multi-member governing body.  28 A.3d 610 (Me. 2011).  There, the plaintiff, Mary Walsh sued the Town of Millinocket under the MHRA, claiming a violation of Maine's Whistleblowers' Protection Act, 26 M.R.S. §§ 831–840, following Millinocket's Town Council 4-3 vote eliminating her position after she reported trail maintenance issues.  *See Walsh*, 28 A.3d 612–13.  Before the vote, Councilor Matthew

Polstein twice confronted Walsh about her comments regarding the trails, and he ultimately voted to eliminate her position. *See id.* at 613–14.

The Law Court held that municipal liability on an employment-discrimination claim is appropriate when "a plaintiff proves, and the jury finds" that the "improper motive or discriminatory animus of one member of a multi-member council or commission" "was a motivating factor or a substantial cause for an adverse employment action taken against a plaintiff who is a member of a protected class or who has engaged in a protected activity." *Id.* at 618.

The Law Court affirmed the trial court's judgment in favor of Walsh, reasoning that she "proved and the jury found such a causal connection between Polstein's discriminatory animus and the adverse employment action taken by the Town." *Id.* Furthermore, because of Polstein's "relationship to the snowmobile club and the trail grooming contractor," he "may have been viewed with significant deference by other councilors who may have had a lesser interest in the issue." *Id.* at 618. Importantly, "Polstein was the deciding vote." *Id.*

Perhaps the Law Court would apply the same standard when analyzing the parties' competing claims for summary judgment on the MHRA claim in this case. The Law Court was, however, applying employment law principles, which might distinguish *Walsh* from this case. *See id.* at 616 (first citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); and then citing *Stanley v. Hancock Cnty Comm'rs*, 864 A.2d 169, 174, 177–78 (Me. 2004)). Alternatively, a "but for" standard may be appropriate because the MHRA requires that the discrimination be "on account of" Plaintiffs' religion. 5

M.R.S. § 4592(1). Should this case proceed to trial, further examination into how the MHRA applies in this case is necessary.

Regardless of whether I apply the *Walsh* standard or a "but for" standard, my analysis above concerning Plaintiffs' constitutional claims applies with equal force when analyzing the MHRA claim. *See supra* at 18–21. Based on the evidence offered by Plaintiffs in response to the School Department's Motion, a reasonable jury could find that a discriminatory animus against Plaintiffs either caused or was a motivating factor or a substantial cause in the School Committee's decision to not offer Plaintiffs a lease. But a reasonable jury could alternatively conclude that the School Committee's decision was based on concerns about entering into a long-term lease and could rule out the Committee having been influenced by a discriminatory animus. Thus, both parties competing claims for summary judgment on the MHRA claim are denied.

## CONCLUSION

Based on this record, the Defendant's Motion for Summary Judgment (ECF No. 27) and the Plaintiffs' Motion for Summary Judgment (ECF No. 29) are **DENIED** because there is a genuine dispute of fact as to whether the Committee's decision to not offer Plaintiffs a long-term lease was motivated by improper considerations.

SO ORDERED.

Dated this 31st day of July, 2024.

/s/ Lance E. Walker
Chief U.S. District Judge