# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MAINE

|  |  |
|---|---|
| **THE PINES CHURCH**, a Maine non-profit corporation; **Matt Gioia**, an individual;<br><br>    Plaintiffs,<br><br>  vs.<br><br>**HERMON SCHOOL DEPARTMENT;**<br><br>    Defendant. | Civil Action No.:  1:23-cv-00214-LEW<br><br>**PLAINTIFFS' CLOSING ARGUMENT** |

**TABLE OF CONTENTS**

I. INTRODUCTION ..................................................................................................................1

II. ARGUMENT ......................................................................................................................2

    A.    Plaintiffs Sought To Use Hermon Facilities On The Equal Terms As Others..................3

    B.    Plaintiffs Have Established Direct Evidence Of Bad Motive By A Majority Of The School Committee..........................................................................................................4

    C.    Superintendent Grant and Principal Walsh Facilitated and Implemented the Discriminatory Process ...............................................................................................11

    D.    Plaintiffs Were Subjected to Disparate Treatment Not Imposed on Any Other Organization ...............................................................................................................14

    E.    The Committee's Stated Concerns Were Pretextual.......................................................15

    F.    The Committee's Actions Demonstrate Consciousness Of Discrimination ...................16

    G.    The Trial Evidence Resolves The Genuine Disputes Identified By This Court At Summary Judgment And Satisfies Both Federal And Maine Standards For Liability....17

III. CONCLUSION .................................................................................................................20

i

## TABLE OF AUTHORITIES

Page(s)

Cases

*Freeman v. Town of Hudson*,
  714 F.3d 29 (1st Cir. 2013)..................................................................................................19
*Good News Club v. Milford Cent. Sch.*,
  533 U.S. 98 (2001)..............................................................................................................19
*Pembaur v. City of Cincinnati*,
  475 U.S. 469 (1986)............................................................................................................19
*Scott-Harris v. City of Fall River*,
  134 F.3d 427 ...................................................................................................................2, 19
*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  582 U.S. 449 (2017)............................................................................................................19
*Walsh v. Town of Millinocket*,
  28 A.3d 610 (Me. 2011) ...................................................................................................2, 19

Statutes

42 U.S.C. § 1983................................................................................................................19

## I. INTRODUCTION

Plaintiffs The Pines Church ("Church") and Pastor Matt Gioia ("Pastor Gioia") respectfully move for entry of judgment in their favor following the bench trial held February 24–25, 2026. The trial record establishes that Hermon School Committee ("Committee") denied Plaintiffs' request for a six-month or a one-year rental use arrangement because of the Church's religious identity. That denial violates the First Amendment and Maine's Public Accommodation Laws.

This case presents a straightforward instance of religious discrimination in the administration of a generally available public benefit. Hermon School Department ("Hermon" or "Department") routinely opens its facilities to community groups for recurring use, including athletic leagues, scouts, and civic organizations. But when Plaintiffs – a local church and pastor – sought the same access, they were treated differently. Committee members opened the inquiry with invasive, belief-based questioning about the Church's positions on same-sex marriage, abortion, gender-affirming care, conversion therapy, and sexual education. Plt. Ex. 6, p. 22-23. A key administrator voiced fear-of-association concerns that linking the School Department to the Church would create a "negative image" and clash with its "mission." Committee members then manufactured unprecedented procedural hurdles that were never imposed on any secular applicant and shifting logistical excuses.

This unconstitutional inquiry into the Church's beliefs tainted the entire decision-making process from the outset and exposed unmistakable hostility toward Plaintiffs' religious exercise. The trial evidence proves religious animus was a motivating factor in the Committee's decision: a majority of voting members acted on impermissible religious considerations, while senior school officials structured and facilitated a process designed to ensure denial of equal access. Under controlling First Circuit precedent and Maine law, the discriminatory motive of even a single decisionmaker is attributable to the governmental body. Here, the record shows far more.

Because the denial of Plaintiffs' rental use request was driven by their religious identity and because Plaintiffs were denied access to a public forum open to all others. Judgment in Plaintiffs' favor is required as a matter of law.

**Page 1 of 20**

PLAINTIFFS' CLOSING ARGUMENT

## II. ARGUMENT

"[D]iscriminatory animus is insidious and a clever pretext can be hard to unmask . . ." *Scott-Harris v. City of Fall River*, 134 F.3d 427, 438. Here, the Hermon School Department attempts to cloak its actions in neutral-sounding concerns about staffing, parking, and scheduling. But the trial record exposes those explanations as pretexts. The evidence – both direct and circumstantial – overwhelmingly demonstrates that the School Committee denied The Pines Church a long-term rental use arrangement because it is a church.

Under the First Circuit's standard, a plaintiff must ordinarily prove "bad motive on the part of a *majority* of the members of the legislative body." *Id.* (emphasis added). That burden, however, is relaxed when a plaintiff shows "(a) bad motive on the part of *at least a significant bloc* of legislators, and (b) circumstances suggesting the probable complicity of others." *Id.* (emphasis added); ECF No. 51, PageID #: 909-10, Order on Motions for Summary Judgment. Maine law goes further still: even the discriminatory animus of a single member is enough to impose liability on the governmental entity if that animus was "a motivating factor or a substantial cause" of the adverse action. *Walsh v. Town of Millinocket*, 28 A.3d 610, 618 (Me. 2011); ECF No. 51, PageID #: 920.

The trial evidence satisfies both standards – and, in fact, satisfies the stricter "majority" rule as well. The School Committee has seven members, five of whom are voting members. A majority therefore requires only three votes. Under the First Circuit's relaxed standard, Plaintiffs need only demonstrate that a significant bloc (as few as two members) acted with bad motive coupled with circumstances suggesting the complicity of others. Plaintiffs have proven far more. Five of the voting members harbored discriminatory motive, two non-voting members openly displayed disdain for the Church, and key administrators upon whom Committee members relied for insight and guidance were themselves entangled in the same religious animus. This evidence is direct, substantial, and uncontroverted. Whether measured by the First Circuit's relaxed standard or the higher majority threshold, the record compels the conclusion that the denial was driven by unconstitutional religious discrimination.

A.    **Plaintiffs Sought To Use Hermon Facilities On The Equal Terms As Others**

Born in Waterville and raised in Guilford, Maine, Pastor Gioia returned to his home state on June 30, 2020, after military service and sixteen years at a nonprofit ministry in Colorado. ECF No. 147, Transcript Volume I, 7:16-24 ("Tr. Vol. I"). He launched The Pines Church on March 7, 2021, at Spotlight Cinema in Orono under a month-to-month arrangement with the understanding that the Church could remain indefinitely. Tr. Vol. I, 11:9-13, 11:20-25, 12:1-7. As the congregation grew, Pastor Gioia actively sought a permanent home in Hermon (where his family lived and his children attended school) so the Church could put down roots in the community it served. Tr. Vol. I, 13:20-22. Haily Keezer, then a newly elected School Committee member, suggested that the Church inquire about renting Hermon school facilities. Tr. Vol. I, 81:20-82:13. Keezer had reviewed the Department's building-use policy and recognized that religious groups were eligible to rent. She told Pastor Gioia it would be "a great idea" given the family's ties to Hermon. Tr. Vol. I, 82:10-13. This recommendation prompted Pastor Gioia to contact the Department in August 2022, setting the process in motion. Tr. Vol. I, 14:9-15:7.

Four of the five voting members declined to support any meaningful rental arrangement, effectively foreclosing the Church's ability to use the facility. This outcome cannot be reconciled with the Department's own Policy KG, which expressly permits both short-term and long-term use of school facilities. Jnt. Ex. 1, p. 1. The Policy provides that school property "should be made available for appropriate community use" when not needed for primary purposes and establishes clear pathways for approving both short-term and long-term rental uses. *Id.* Nor is this outcome consistent with the Department's established practice of allowing numerous secular groups and entities to use Hermon school facilities for varying durations. Tr. Vol. I, 143:10-25 (discussing a 20-year lease); Jnt. Ex. 7, p. 1 (unlimited monthly use), p. 16 (nine-month use arrangement), p. 8 (nine-month use arrangement); Plt. Ex. 3, pp. 1, 4 (two-year lease), pp. 7, 9 (undisclosed long-term lease). By refusing to approve a one-year arrangement, despite the Policy's plain terms, the Committee departed from its own neutral framework and denied Plaintiffs the very opportunity the Policy is designed to ensure.

**B.**     **Plaintiffs Have Established Direct Evidence Of Bad Motive By A Majority Of The School Committee**

The review of Plaintiffs' request commenced with an overtly unconstitutional and improper inquiry into Plaintiffs' religious beliefs. After reviewing Pastor Matt Gioia's written proposal and hearing his presentation at the November 7, 2022, meeting, Committee Member Chris McLaughlin publicly asked whether the Church was affiliated with a denomination, an inquiry wholly irrelevant to a neutral facility rental decision. Jnt. Ex. 5, 46:45–46:55; ECF No. 148, Transcript Volume II, 85:10-11 ("Tr. Vol. II). Pastor Gioia found the question odd and irrelevant to a rental use request. Tr. Vol. I, 28:24-29:13. The reasons why McLaughlin asked such an intrusive question soon became apparent. He then escalated that inquiry by submitting a series of written questions, through the Superintendent, targeting the Church's religious beliefs on same-sex marriage, abortion, gender-affirming care, conversion therapy, and sexual education. Plt. Ex. 6, p. 22-23. McLaughlin told the Superintendent that he "wanted to get a better sense of how the Pines Church approaches issues of diversity, equity, and inclusion around their messaging on some key issues relevant to marginalized communities." *Id.*, p. 22. McLaughlin admitted these questions would not be posed to secular organizations and further acknowledged that his own views conflicted with traditional religious positions. Tr. Vol. II, 89:22-91:1-2, 91:16-19. His questioning was thus not operational. It was ideological, aimed at determining whether the Church's beliefs were acceptable. Here, the initial inquiry evidenced a discriminatory intent. And as the evidence will show, all of the claimed reasons for denying the Plaintiffs a six month and one year rental use arrangement were pre-textual. McLaughlin ultimately voted to deny Plaintiffs any rental use arrangement (Tr. Vol. II, 101:17-19; Jnt. Ex. 4, p. 4), confirming that his decision was driven by disagreement with the Church's beliefs rather than any neutral policy.

Committee member Stephanie Oiler's initial questioning also underscores the improper basis for her decision to refuse to vote in support of a long-term rental arrangement for the Church. At the November 7, 2022, committee meeting, following Pastor Gioia's verbal presentation regarding the Church's rental request, she asked whether this was a "normal" type of lease for public schools. Jnt. Ex. 5, 47:19; Tr. Vol. I, 171:19–21. Superintendent Micah Grant responded by referencing another Maine

school renting space to a church and offering to gather additional information. Jnt. Ex. 5, 47:28–47:53. As the trial testimony confirms, Oiler's inquiry was directed at whether it was "normal" for a *church* to use public school facilities. Tr. Vol. I, 173:9–11. This inquiry singled out the Church's religious identity and questioned whether leasing school facilities to a religious organization was even appropriate or customary.

Her subsequent conduct confirms that her stated concerns were not genuine, but pretextual. At the December 12, 2022, meeting, Oiler asked whether Hermon offers six-month leases (Jnt. Ex. 6, 59:43) and was expressly informed by Superintendent Grant that such arrangements are "very common." Jnt. Ex. 6, 59:50–1:00:15. She later revisited the issue, again inquiring whether a six-month term was possible, and Superintendent Grant once more confirmed that it was. Jnt. Ex. 6, 1:05:39–1:06:17. Yet, when a six-month option was presented, she declined to support it and did not second the motion for that term. Jnt. Ex. 6, 1:19:46-1:20:18. Instead, she moved for a month-to-month arrangement, despite knowing that such short-term use did not require Committee approval. Tr. Vol. I, 164:2–9. Next, after Principal Brian Walsh raised concerns about the school being "associated" with the Church's beliefs, Oiler expressly directed the Committee to factor Principal Walsh's statements into its decision. Jnt. Ex. 6, 1:21:16.

Oiler's reliance on logistical concerns fares no better. She raised a series of purported "concerns" about renting to the Church, all of which the Superintendent directly addressed and resolved. Although she testified that she typically defers to the Superintendent on such matters, she rejected every assurance he provided. Jnt. Ex. 6, 58:56–59:12; 1:00:15–1:01:10; 1:01:40–1:02:32; Tr. Vol. I, 184:9-17, 160:13-18, 162:10-12. She questioned whether the Department would incur staffing costs, but Superintendent Grant confirmed that the Church would pay for staff and a cleaning fee. Jnt. Ex. 6, 58:56–59:12. She raised the possibility of scheduling conflicts, yet Superintendent Grant assured the Committee he would not bring forward a request that conflicted with existing uses and confirmed that while other groups might be present, there would be no conflict for space. Jnt. Ex. 6, 1:00:15–1:01:10. He also told the Committee that the school's needs would take priority should any conflicts arise. Jnt. Ex. 6, 1:01:10; Tr. Vol. I, 184:9-12. Oiler herself admitted she was unaware of any actual conflicts. Tr. Vol. I, 177:17–19. She also

speculated about parking and attendance, but Superintendent Grant responded that such capacity concerns were unlikely and "not at all" worrisome. Jnt. Ex. 6, 1:01:40–1:02:32.

Critically, Oiler took no steps to substantiate the concerns she raised. Although she claimed to be worried about overcrowding, she never proposed or imposed any attendance cap. Tr. Vol. I, 181:25-182:1–2, 184:1-8. At trial, Oiler conceded she did not even know how many parking spaces the high school had. Tr. Vol. I, 179:5–6. She never contacted the custodial department to assess staffing availability, (Tr. Vol. I, 187:25–188:4), and never verified whether custodial coverage existed even for the month-to-month arrangement she proposed. Nor did she follow her usual practice of relying on administrative expertise. Tr. Vol. I, 160:13–18, 162:10-12. At trial, she admitted, "There's going to be times during the committee meetings where administration will come and provide information to us and I will consider that." Tr. Vol. 1, 162:10-12. Yet here, she disregarded every assurance provided by the Superintendent.

In sum, Oiler raised a series of shifting logistical concerns – staffing, scheduling, parking, and custodial coverage (Jnt. Ex. 6, 58:56–59:00; 1:00:15–1:01:26; 1:01:40–1:02:01) – all of which were directly addressed and resolved, yet she still refused to agree to any long term rental use arrangement (or six month arrangement) for the Church. Jnt. Ex. 4, pp. 3-4; Tr. Vol. I, 190:5-13. She never investigated the issues she claimed to find problematic and later, while serving as Committee Chair, she refused Committee member Keezer's request to place the Church's rental use request back on the agenda. Plt. Ex. 5, p. 12; Tr. Vol. I, 191:16–192:2; Tr. Vol. II, 116:9-11 (confirming that items placed on the school committee agenda are determined by the Committee chair). The record thus demonstrates that Oiler's stated reasons were not the real reasons; they were pretext for denying the Church access to school facilities.

Committee Chair Jesse Keith further ensured that Plaintiffs' request was denied through procedural irregularities and the suppression of contrary input. When Committee member Keezer learned that the Church's initial request had been denied in August 2022 by Principal Walsh, she promptly emailed the administration on September 23, 2022, urging that the request be evaluated fairly and in accordance with the Department's nondiscrimination policy. Plt. Ex. 5, p. 5; Tr. Vol. I, 92:1-96:25

**Page 6 of 20**

(Keezer: "I felt that I wanted to caution the school and make sure that they were considering in assessing their determination of whether to rent to the Church fairly."). She blind-copied Chair Jesse Keith to ensure he was aware, yet Keith did not respond to or address her concerns. Tr. Vol. I, 95:25-96:8-14.

Immediately after the November 7, 2022, Committee meeting in which Paster Gioia presented to the Committee, former Committee member Debora Farnham emailed Keith and Committee member Shorey declaring that it was "not in our communities [sic] best interest to lease one of our school facilities to any religious organization." Plt. Ex. 5, pp. 30-31. She warned that approving the Church's request would set a dangerous precedent and questioned "what's to prevent another religious group from approaching us to lease one of our other facilities?". *Id.*, p. 31. Neither recipient, either of whom had previously served on the Committee with Ms. Farnham, raised any objection to this overtly anti-religious position by a form committee member. Tr. Vol. II, 8:17-23, 52:16-21.

Keith also prevented Plaintiffs from responding to the very concerns being used to justify denial of a long-term rental use arrangement. At the December 12, 2022, meeting, although Pastor Gioia was present and the Church's rental use request was on the agenda, Keith refused to allow him to speak. Jnt. Ex. 6, 1:07:20; 1:21:49. Chair Keith refused to let Pastor Gioia speak despite two requests from Member Keezer (Jnt. Ex. 6, 1:07:20; 1:21:49; Tr. Vol. I, 114:8–117:4), invited only Principal Walsh to address the Committee, and seconded a motion for a month-to-month arrangement he knew fell outside the Committee's authority. Tr. Vol. I, 203:20–204:3. Notably, although Keith typically relied on the Superintendent's input in evaluating such matters, here he disregarded the Superintendent's repeated assurances that the logistical concerns had been resolved. Tr. Vol. I, 199:8-10.

Keith's conduct is particularly telling in light of the explicit warnings he received about religious discrimination. On December 13, 2022, and again on February 7, 2023 (and previously on September 23, 2022), Committee member Keezer raised concerns that the Church was being treated differently based on its religious beliefs. Although Keith, as Chair, received those warnings he took no action to investigate, correct, or meaningfully address the issue. Plt. Ex. 5, pp. 3, 9–10. Keezer's December 13, 2022, email to Keith explicitly warned of differential treatment and potential legal liability. Plt. Ex. 5, p. 3; Tr. 129:22-132:25 (Keezer: "I was concerned that there was valid reason that we could potentially have a lawsuit

**Page 7 of 20**

PLAINTIFFS' CLOSING ARGUMENT

come, yes."). She noted the Church was being treated differently than secular groups and that the process appeared tainted by religious animus. Tr. Vol. I, 131:8-25. On February 7, 2023, Keith forwarded Keezer's warning to the Committee and Superintendent, but notably excluded Keezer, the sole supporter of the Church's rental request, from the communication. Plt. Ex. 5, p. 9; Tr. Vol. I, 138:19-24.

Taken together, Keith's actions, including endorsing a procedurally improper motion, silencing Plaintiffs, and disregarding explicit warnings of discrimination, reinforced and enabled the Committee's treatment of The Pines Church. His conduct was not neutral facilitation. It was active participation in a process that denied Plaintiffs a fair and even-handed decision.

Committee member Kristen Shorey likewise acted on improper considerations and departed from neutral decision-making. Although she testified that she typically relies on the expertise of school administrators when evaluating agenda items, Tr. Vol. II, 32:25–33:13, she did not do so here. Instead, she acknowledged personal "apprehension" about a church using school facilities, an apprehension she attributed solely to the fact that a church had not previously made such a request. Tr. Vol. II, 54:22–55:5. That rationale is not a neutral operational concern. It reflects discomfort with the religious identity of the applicant. Shorey expressly admitted that Committee member McLaughlin's religion-based questions would not be asked of secular groups like Hermon Rec and basketball programs. Tr. Vol. II, 56:20–57:3, 58:1–8, 59:21–25 ("Q: The questions that Mr. McLaughlin sent would not be appropriate questions for Hermon Rec or any basketball lease that are interested in using school facilities, correct?" Shorey: "They would not be expected . . .[b]ecause Hermon Rec is not a church."). And she previously refused to characterize McLaughlin's questions as improper. Tr. Vol. II, 62:9-12. At the same time, Shorey admitted that the School Department routinely permits other community groups, such as Hermon Rec and basketball programs, to use school facilities on a recurring, year-round basis, including weekend use. Tr. Vol. II, 34:11–21, 36:1–2, 36:22–25. She specifically acknowledged that Hermon Rec has been using school facilities on a year-round basis since at least 2004. Tr. Vol. II, 36:22-25, 36:11-13. Her refusal to support a year-round or long-term rental use arrangement for Plaintiffs cannot be reconciled with that established practice.

Shorey's conduct during the decision-making process further underscores this improper motive. She raised logistical concerns about insurance and snow removal, but Superintendent Grant confirmed that the Church would be required to provide its own insurance and that snow removal was handled as a matter of course regardless of the user. Jnt. Ex. 6, 1:04:43-1:05:39; Tr. Vol. II, 53:11–17, 54:18–21. Despite those assurances, and despite the agenda item requesting a one-year arrangement, she refused to support that term. Jnt. Ex. 4, pp. 3-4; Tr. Vol. II, 53:22–54:3. Nevertheless, she participated in the vote on the improper month-to-month arrangement, demonstrating that the Committee had intentionally diverted from standard procedures.

Her contemporaneous conduct reflects the same bias: she exchanged mocking messages about the Church, including a text ridiculing its circumstances with an eyeroll and expletive emoji, and participated in disparaging Committee member Keezer, the sole supporter of the Church's request. Plt. Ex. 5, pp. 35, 38; Tr. Vol. II, 68:22–69:18, 74:8–22. These actions are inconsistent with neutral governance and instead reflect hostility toward Plaintiffs and their religious beliefs.

Finally, Shorey's involvement in the process itself was irregular. She was personally alerted to Pastor Gioia's request by Principal Walsh, even though she acknowledged that such notice was not standard practice for rental applications. Tr. Vol. II, 42:15–22. This is particularly notable given the principal's apparent bias against the Church, making his decision to share the request with a Committee member even more significant. And although she received a warning forwarded by the Committee Chair from Committee member Keezer member raising concerns about religious discrimination, she did not object or take any action in response. Plt. Ex. 5, p. 9. Taken together, Shorey's statements, actions[1], and departures from standard practice confirm that her decision was not grounded in neutral criteria, but in impermissible considerations tied to Plaintiffs' religious identity.

---

[1] While presiding over the meeting in which Pastor Gioia delivered his oral presentation, Shorey curtailed public comment, citing a supposed time violation that did not actually occur. Tr. Vol. II, 44:4–10; 51:19–24. By contrast, she limited community member Shawn McBreairty's comments not for exceeding time limits, but because he expressed opposition to a transgender book display. Jnt. Ex. 5, 26:54–28:09. Although unrelated to the Church's rental request, her decision to shut down public comment on this topic is notable, given that another Committee member had explicitly sought to hear the Church's views on gender identity, and she did not find that inquiry inappropriate. Tr. Vol. II, 62:9-12.

PLAINTIFFS' CLOSING ARGUMENT

The Committee's lack of neutrality is further revealed by the legal memorandum it received from counsel prior to the December 12, 2022, meeting. *See* Dft. Ex. 1. Rather than requesting balanced, neutral guidance on how to apply Policy KG and the First Amendment to a religious organization's request for equal access, counsel was asked and provided a narrow opinion framed entirely in the negative. After acknowledging that Policy KG allows organizations access to school facilities "for appropriate community use," counsel wrote "Specifically" and posed two carefully worded questions: (1) "*Must the committee deny* the request on the grounds that permitting the Church to access school space constitutes an unlawful establishment of religion?" and (2) "*Would refusing* to lease the space to the Church because the Church is a religious organization violate the Church's right to freely exercise its religion?" *Id.* (emphasis added). The second question, by its very wording, sought legal reassurance that the Committee could lawfully refuse the Church *precisely because it is a religious organization*. This negative framing supplied the Committee with a ready blueprint for denial rather than an objective analysis of its constitutional obligation to treat the Church equally under its own policy and the First Amendment. By soliciting and considering legal advice structured this way, the leadership demonstrated that the decision-making process was not an open, neutral evaluation – it was a search for constitutional cover to say "no." When viewed together with the belief-based questioning, procedural irregularities, and pretextual logistical concerns already discussed, this evidence leaves no doubt that religious animus was a motivating factor in the denial of Plaintiffs' rental use request.

The Committee refused to grant The Pines Church the one-year rental use arrangement it requested and instead offered only a month-to-month alternative, an illusory "yes" that, in substance, was a definitive "no." Tr. Vol. I, 42:9-13 (Matt Gioia: "We were looking for something more stable. A month-to-month felt like . . . [] a no wrapped in a yes. It was problematic for us."). The combined actions of McLaughlin, Oiler, Keith, and Shorey therefore reflect bad motive on the part of at least a significant bloc of legislators.[2]

---

[2] Based on the First Circuit's relaxed standard, the Plaintiff need only show bad motive by a substantial bloc of legislators. A relaxed standard in this case would require a showing of less than three committee members. Plaintiffs far exceed this showing.

C.    **Superintendent Grant and Principal Walsh Facilitated and Implemented the Discriminatory Process**

Additionally, Hermon's senior administrators did not operate as neutral gatekeepers. They structured, advanced, and reinforced a process that enabled the discriminatory denial of access to The Pines Church.

Superintendent Grant did not act as a neutral administrator. As the official responsible for overseeing Department operations (Tr. Vol. II, 114:25-115:20) and bringing items before the School Committee (Vol. II, Tr. 116:2-4), Superintendent Grant controlled the agenda, structured the process, and affirmatively enabled the Committee's discriminatory treatment of The Pines Church.

Most notably, Superintendent Grant sent Committee member McLaughlin's belief-targeted questions directly to Pastor Gioia. Plt. Ex. 6, pp. 13, 22; Tr. Vol. II, 134:7-9, 22-24, 136:17-19. Superintendent Grant admitted he could have refused to forward the questions and could have identified them as improper and outside the normal Department process. Tr. Vol. II, 135:20-25, 136:11-19. Instead, he not only forwarded them but reformatted them into a clean Word document to make it easier for Pastor Gioia to respond. Plt. Ex. 6, pp. 13-15; Tr. Vol. II, 134:7-9, 134:22-24, 134:25-135:8, 136:17-19. By doing so, Superintendent Grant actively enabled and lent institutional weight to an invasive inquiry that singled out the Church's religious beliefs for special scrutiny.

Superintendent Grant further subjected Plaintiffs to a process no other applicant had ever faced. Despite admitting there was no policy requiring oral presentations or written proposals for long-term facility requests, he required Pastor Gioia to provide both. Tr. Vol. I, 46:6-7; Tr. Vol. II, 125:18-25. At the same time, he failed to provide the standard Building/Facilities Request Form and did not inform Plaintiffs of the ordinary administrative process for obtaining short-term approval, despite having routinely approved multi-month and recurring uses for secular organizations without Committee involvement. Tr. Vol. II, 121:3-17, 122:16-25, 123:12-20, 169:21-23, 170:9-13, 170:14-16. Pastor Gioia confirmed that Superintendent Grant never provided him with any forms or explained the standard facility-use process during their meetings or tours. Tr. Vol. I, 22:23-23:24. Rather than facilitating access, he diverted Plaintiffs into a more burdensome, highly scrutinized, and unprecedented process.

**Page 11 of 20**

PLAINTIFFS' CLOSING ARGUMENT

Superintendent Grant compounded these procedural irregularities by refusing to correctly address Pastor Gioia's six-month rental use request following the denial of the Church's one year request. After the December 12, 2022, meeting, Pastor Gioia, seeking a compromise and some access to the facility, reached out to Superintendent Grant to request a six-month arrangement. Tr. Vol. I, 43:22-44:4. In response, Superintendent Grant incorrectly told Pastor Gioia that the six-month request was barred by the 90-day rule and refused to refer it for administrative short-term approval.[3] Plt. Ex. 6, p. 24; Tr. Vol. II, 150:20–151:16. By misrepresenting the procedural rules and refusing to refer to the six-month request to another administrator for short-term use, Superintendent Grant effectively obstructed and delayed Plaintiffs' efforts to secure a legitimate rental arrangement.

Finally, Superintendent Grant's own testimony reveals he fully understood the religious dynamics at play. He repeatedly described feeling like "Daniel in Babylon" while serving as Superintendent (Tr. Vol. II, 155:13-17, 157:12-15), acknowledging the tension between his own Christian beliefs and certain district policies. He admitted that The Pines Church's beliefs were consistent with his own and reflected a traditional biblical worldview. Tr. Vol. II, 177:13-16, 178:1-2, 178:18-22. Despite initially being "pro them being there" and seeing no legitimate logistical barriers (Tr. Vol. II, 124:21-25, 141:19-25, 152:11-17), Superintendent Grant chose not to exercise his independent authority to approve a short-term use and instead facilitated a process he knew would expose the Church to the Committee's hostility. In what appears to be a tacit acknowledgment of the Committee's bias against the Church, Superintendent Grant advised Pastor Gioia in January 2023 that it would be more advantageous to work directly with him on any future requests to rent school facilities. Plt. Ex. 6, p. 24.

Keezer met directly with Superintendent Grant shortly after her September 23, 2022, email and reiterated her concerns that the Church was being treated differently. Tr. Vol. I, 97:19-98:17. Superintendent Grant acknowledged the request but took no immediate corrective action. Tr. Vol. I, 98:1-10.

---

[3] Even if that rule applied, Committee Chair Oiler declined to reinstate the Church's rental request nearly a year later, despite being asked to place it back on the Committee's agenda. Plt. Ex. 5, p. 12; Tr. Vol. I1, 139:1-140:18.

In sum, rather than serving as a neutral administrator, Superintendent Grant controlled, distorted, and weaponized the process to the Committee's detriment, ensuring Plaintiffs faced heightened scrutiny and obstructed access.

Principal Brian Walsh likewise played a central role in injecting impermissible considerations into the decision-making process. Although the Church's request was initially denied through his office on purported staffing grounds (Tr. Vol. I, 14:9-15:7), his statements at the December 12, 2022, Committee meeting revealed the true basis for opposition. He repeatedly warned against any association between Hermon High School and the Church, declaring: "If you put Hermon High School's name with a church or another organization with different beliefs than the school has, I see that as problematic." Jnt. Ex. 6, 1:11:33-1:13:15. He expressed discomfort that students would feel "their vision or their mission is now ours," stressing that "there's a blurred line when it comes to that." *Id.* He further cautioned that tying the school's name to the Church would create "this blur . . . of, is this a school-sponsored event." *Id.*, 1:15:16-1:16:06. These statements constitute direct evidence of religious animus. They reflect not neutral operational concerns, but ideological opposition to the Church's beliefs and a deliberate desire to avoid any perceived association with them.

Principal Walsh also deviated from standard practice by personally informing Committee member Kristen Shorey of the Church's request. Tr. Vol. II, 42:15-22. His views carried particular weight: he had longstanding relationships with multiple Committee members, and Committee members admitted they routinely rely on the input and expertise of paid administrators when making decisions. Tr. Vol. I, 160:13-18; 162:10-12 (Oiler: "There's going to be times during the committee meetings where administration will come and provide information to us and I will consider that."); 199:8-10, 199:8-10 (Keith), 201:19-23 (Keith: "I did want to hear his [Walsh] opinion as that school's administrator, yes."); Tr. Vol. II, 32:25–33:13 (Shorey: affirming that the insight of school administrators would be helpful to her as a committee member). Consistent with that practice, Committee member Stephanie Oiler expressly instructed her colleagues to "factor in Mr. Walsh's comments" during deliberations. In this way, Principal Walsh's discriminatory rationale was not only voiced but arguably shaped the Committee's decision, becoming a driving force behind the ultimate denial of the Church's long-term rental request.

Superintendent Grant and Principal Walsh did not merely participate in the process; they shaped it. They imposed atypical procedures, facilitated impermissible religious inquiry, amplified concerns about "association" with the Church's beliefs, and steered the decision-making process toward a discriminatory outcome. Their actions provided the structure, justification, and momentum for the Committee's denial. When the administrators charged with ensuring neutrality instead enable and reinforce religious discrimination, the resulting decision cannot stand.

**D.     Plaintiffs Were Subjected to Disparate Treatment Not Imposed on Any Other Organization**

The unequal treatment Plaintiffs faced is stark and undisputed. No other organization seeking to use Hermon School Department facilities was required to deliver an oral presentation to the Committee. Tr. Vol. I, 165:21-166:1, 28:8-10, 203:12-19; Tr. Vol. II, 125:22-25. No other applicant was questioned about its beliefs, values, or positions on controversial social issues. Plaintiffs alone were subjected to that scrutiny.

By contrast, secular organizations routinely receive equal or greater access with far less process. An internet services company was granted a 20-year lease without any oral presentation or belief-based questioning. Tr. Vol. I, 143:10-25. A two-year lease approved in 2016 passed unanimously by the Committee, again without any such requirements. Plt. Ex. 3, pp.1, 4. Another long-term lease likewise passed unanimously. *Id.*, pp. 7, 9. As an administrator, Superintendent Grant himself approved numerous recurring uses without Committee involvement, including arrangements lasting up to nine months or with no defined end date. Tr. Vol. II, 120:23-121:3-17, 122:16-25, 123:1-11, 123:12-15, 123:16-20; Jnt. Ex. 7, pp. 8, 12, 16. The Builders Club met weekly for up to nine months. Jnt. Ex. 7, p. 8. The Hermon Cub Scouts were approved for approximately nine months each year. *Id*, p. 16. A Girl Scout troop was approved for monthly use without limitation. *Id.*, p. 1. None of these groups were asked to justify their beliefs or subjected to ideological screening. Committee members knew that various organizations, including AAU basketball, Boy Scouts, and Girl Scouts, had been permitted to use Hermon facilities for years without being required to present or defend their views on abortion, same-sex marriage, conversion therapy, or other cultural issues. Tr. Vol. 1, 131:16-132:7, 166:5-11, 178:25-179:1, 204:7-206:1; Tr. Vol. II, 34:11–21, 36:1–2, 36:22–25.

PLAINTIFFS' CLOSING ARGUMENT

Keezer, who reviewed the Department's building-use policy before becoming a Committee member, confirmed that political and religious groups were expressly eligible to rent. Tr. Vol. I, 81:20-82:13. She was personally aware of the Hermon Rec department, AAU basketball, PTA/PAC, Boosters, and other private entities using facilities on a recurring basis without similar scrutiny. Tr. Vol. I, 86:19-87:25, 88:13-89:12, 90:1-91:10.

The only meaningful distinction between Plaintiffs and these other users is that Plaintiffs are a church.[4] Keezer recognized this distinction, noting that "when Mr. Walsh or school committee members were referring to the vision of the school or what the school's position is on issues, they were referring to those in contrast to what the Church is or that they felt it would be contradictory to us . . . as a district." Tr. Vol. I, 132:8-18. That difference – and that difference alone – explains the heightened scrutiny, additional procedural burdens, and ultimate denial. Such disparate treatment is compelling evidence that religious animus was the motivating factor.

### E.    The Committee's Stated Concerns Were Pretextual

The Committee's stated justifications – staffing, parking, scheduling, and custodial coverage – collapse under scrutiny. Superintendent Grant directly addressed each concern with specific, workable solutions. Jnt. Ex. 6, 58:56–59:12; 1:00:15–1:01:10; 1:01:40–1:02:32; Tr. Vol. I, 184:9-17; Tr. Vol. II, 53:11–17, 54:18–21. He confirmed that Plaintiffs would pay for custodial services and cleaning fees, that custodians could be assigned overtime, that no scheduling conflicts existed, and that school activities would always take priority. *Id.*; *see also* Plt. Ex. 13, p. 1 (Custodian Job Description: "Performance Responsibilities: May be assigned to work overtime hours, including weekends, for snow removal and to cover student/community activities"). He further explained that parking capacity would not be an issue and testified that he would not have presented the request at all if legitimate operational concerns existed. Jnt. Ex. 6, 1:00:15–1:01:10, 1:02:01. Although a Committee member may have had concerns about staffing, Superintendent Grant, charged with administering the Department, had direct knowledge of

---

[4] While Defendants may attempt to distinguish these groups as having submitted building-use requests rather than lease requests, that distinction is immaterial. Pastor Gioia understood that the school's activities would take priority and that the Church would be sharing space with other organizations; for him, lease and building-use requests were functionally interchangeable. Policy KG also permits long-term use arrangements. Jnt. Ex. 1.

staffing needs and limitations. Tr. Vol. II, 115:4–20. It would make little sense for him to present a rental use proposal to the Committee if he knew the Department lacked the capacity to support it.

The objective evidence confirms this. Between September 2022 and June 2023, Hermon High School hosted approximately 32 non-school events on Sundays – the very day Plaintiffs sought to use the facility. Plt. Ex. 13, pp. 12-16. Sunday use was not hypothetical; it was routine.

Yet Committee members made no effort to verify the concerns they claimed to have. Oiler admitted she never contacted the custodial department. Tr. Vol. I, 187:25–188:4. Keith admitted he never reviewed the school calendar or conducted any independent inquiry. Tr. Vol. II, 17:24-18:2. These failures are telling. When decisionmakers raise concerns but decline to investigate them – especially after those concerns have been directly addressed – it strongly indicates that the concerns are not genuine.

Here, the record shows exactly that. The Committee rejected Plaintiffs' request despite the absence of any legitimate operational barrier. The only factor that distinguishes Plaintiffs from other approved users is their religious identity and beliefs. The Committee's stated reasons are therefore pretextual.

**F.      The Committee's Actions Demonstrate Consciousness Of Discrimination**

The Committee's conduct supplies powerful evidence that its members knew the decision rested on religious animus rather than neutral operational concerns. A body acting in good faith on legitimate logistical grounds does not ostracize its sole supporter, ignore repeated warnings of unconstitutional discrimination, or trade mocking private messages about the applicant and the member who dared to defend equal access. Yet, that is precisely what happened here.

Keezer, the only voting member who supported granting the Church a six- or twelve-month rental arrangement and the only self-identified Christian on the Committee, was systematically sidelined. She was excluded from key internal emails and communications concerning the very issues she had raised. Plt. Ex. 5, pp. 3, 9; Tr. Vol. I, 137:13-20, 138:19-24. Her repeated requests to allow Pastor Gioia to address the Committee were denied. Jnt. Ex. 6, 1:07:20; 1:21:49; Tr. Vol. I, 114:8-20, 116:22-117:4. When she later asked, as a sitting member, to place the Church's request back on the agenda, Chair Oiler refused. Plt. Ex. 5, p. 12; Tr. Vol. I, 139:1-140:14, 191:16–192:2; Tr. Vol. II, 116:9-11. In private text

exchanges, fellow members ridiculed Keezer, calling her "so dumb," assigning her a mocking faith-based nickname "Grace," and using derogatory language. Plt. Ex. 5, p. 38; Tr. Vol. II, 71:16-17. Keezer herself testified that she was "left out of all communication" and felt she was being "segregated from information because of [her] faith." Tr. Vol. I, 137:18-20, 136:22-23.

At the same time, Keezer's explicit warnings of discrimination went unheeded. On September 23, 2022, December 13, 2022, and February 7, 2023, she alerted the administration that the Church was being treated differently from secular groups and that the Department risked legal liability. Plt. Ex. 5, pp. 3, 5, 9-10; Tr. Vol. I, 129:22-132:25. Superintendent Grant received those warnings but chose not to respond or take corrective action. Tr. Vol. II, 147:7-8, 147:12-15. The Committee's silence in the face of these repeated concerns is not the behavior of officials confident that their decision rested on staffing, parking, or scheduling. It is the behavior of officials who recognized the constitutional problem and chose to look the other way.

The only self-identified Christians who participated in the rental process – Keezer and Superintendent Grant – were both subjected to ostracization. That fact is not coincidence; it is confirmation of the religious animus that infected the Committee. When a governmental body punishes support for a religious applicant, ignores warnings of illegality, and privately mocks both the applicant and its defender, it reveals its own consciousness of wrongdoing. The Committee's conduct therefore cements what the direct evidence, disparate treatment, and pretext already established: the denial of Plaintiffs' six- and twelve-month rental requests was motivated by the Church's religious identity.

### G.    The Trial Evidence Resolves The Genuine Disputes Identified By This Court At Summary Judgment And Satisfies Both Federal And Maine Standards For Liability

In its Order on Motions for Summary Judgment,[5] this Court identified the central factual dispute that required trial: whether the School Committee's refusal to offer Plaintiffs a six- or twelve-month rental use arrangement "was motivated by animus against their sincerely held religious views" or resulted from "humdrum, benign space and cost concerns". ECF No. 51, PageID #: 895–96. The Court highlighted

---

[5] Given this Court's thorough familiarity with the full record developed through discovery, summary judgment briefing, and the two-day bench trial, Plaintiffs respectfully incorporate by reference the arguments and legal analysis set forth in their Motion for Summary Judgment. ECF No. 29.

the probative force of Committee Member McLaughlin's "relatively blatant bias" in demanding the Church's positions on same-sex marriage, abortion, gender-affirming care, conversion therapy, and related flashpoints, as well as the "somewhat more tepid bias" reflected in fear-of-association comments suggesting that leasing to the Church might create a "negative image," fail to fit the Committee's "goals," or comport with the School Department's "mission" and "evidently its own beliefs." *Id.* at PageID #: 896. The Court agreed that the Department's logistical concerns were "far from conclusive based on the summary judgment record." *Id.* These "competing characterizations of the Committee's motivations" formed "the most conspicuous reason" for denying summary judgment. *Id.* The Court also noted that Plaintiffs' constitutional claims turned on municipal-liability principles under § 1983 and that the same motivation dispute precluded summary judgment on the Maine Public Accommodation claim. *Id.* at PageID #: 903–04, 910, 920.

The trial record overwhelmingly resolves every one of these disputes in Plaintiffs' favor. The evidence demonstrates that religious animus—not neutral logistical considerations—was a motivating factor in the denial. As this Court anticipated, McLaughlin's overtly ideological questioning (which he admitted would never be posed to secular groups) tainted the entire process from the outset. Principal Walsh, a school administrator to whom Committee members routinely looked for guidance and information to inform their decisions, issued direct warnings against any "association" between Hermon High School and the Church's beliefs, echoing the very "fear-of-association" bias the Court flagged. The purported operational concerns (staffing, parking, scheduling, cleaning) were each addressed and refuted on the record by Superintendent Grant, yet Committee members never investigated them, and instead, disregarded his assurances, and applied unprecedented procedural hurdles that no other applicant had ever faced. The disparate treatment compared to secular organizations granted long-term or recurring access without scrutiny confirms that religion was the but-for cause. Private mocking communications[6] and the Committee's refusal to heed Member Keezer's repeated warnings of unconstitutional differential treatment further reveal consciousness of wrongdoing.

---

[6] In addition to the mocking communications already detailed (II.B–C), the two remaining Committee members, CoWallis and Knowles, exchanged texts with one another that further mocked the Church and suggested it should remain at the theatre so it would not "be perceived as being associated with any certain entity." Plt. Ex. 5, p. 25.

This proof satisfies the requirements for municipal liability under 42 U.S.C. § 1983. Under Policy KG, long-term rental use arrangements are authorized solely by the Hermon School Committee upon the Superintendent's recommendation. The Committee is therefore the final policymaker, and its decision constitutes official municipal policy. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986); *Freeman v. Town of Hudson*, 714 F.3d 29, 38 (1st Cir. 2013). Plaintiffs have proven bad motive on the part of a significant bloc of legislators (indeed, a majority of the voting members) coupled with overwhelming circumstances demonstrating the complicity of others, satisfying the First Circuit's standard in *Scott-Harris*, 134 F.3d 427. Plaintiffs' showing is even stronger under Maine law, which imposes liability whenever the discriminatory animus of even a single decisionmaker was "a motivating factor or a substantial cause" of the adverse action. *Walsh*, 28 A.3d at 618.

The constitutional violations follow directly. By denying Plaintiffs equal access to a limited public forum because of their religious identity and viewpoint, the School Department engaged in unconstitutional viewpoint discrimination in violation of the Free Speech Clause. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112 (2001). The denial also burdened Plaintiffs' free exercise of religion by withholding a generally available benefit (facility access under Policy KG) solely on account of their religious status, triggering strict scrutiny that the Department cannot satisfy. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017). The process and outcome reflect hostility toward Plaintiffs' orthodox Christian beliefs, violating the Establishment Clause's prohibition on official preference against disfavored religious viewpoints. Finally, the same discriminatory conduct violates the Maine Human Rights Act's prohibition on denying equal access to public accommodations on the basis of religion.

Defendant will point to routine logistics, but that excuse collapses under scrutiny. With no conflicts, no staffing issues, and no payment concerns, there was no legitimate reason to deny the Church's six month or one-year rental use request. The record leaves only one conclusion: the Committee turned the Pines Church away because it is a religious institution.

**Page 19 of 20**

PLAINTIFFS' CLOSING ARGUMENT

### III. CONCLUSION

For the reasons set forth above, the trial record overwhelmingly establishes that the Hermon School Committee denied Plaintiffs equal access to a public benefit solely because of their religious identity. This unconstitutional viewpoint discrimination violates the First Amendment and Maine's Public Accommodation Laws.

Plaintiffs therefore respectfully request that the Court enter judgment in their favor and award the following relief:

1. A declaratory judgment that the Hermon School Department's denial of Plaintiffs' rental use request violated the First Amendment and Maine law;

2. Injunctive relief enjoining the unconstitutional policy of Defendant that denied a six-month and a one-year rental use arrangement to Plaintiffs;

3. Nominal damages; and

4. Any other relief the Court deems just and proper.

ADVOCATES FOR FAITH & FREEDOM

Dated: April 2, 2026

/s/ Julianne Fleischer
Julianne Fleischer, Esq., Bar No. 337006
Rober Tyler, Esq., Bar No. 179572
jfleischer@faith-freedom.com
btyler@faith-freedom.com
25026 Las Brisas Road
Murrieta, California 92562
Tel: (951) 600-2733

/s/ Wenonah M. Wirick
Wenonah M. Wirick, Esq., Bar No. 9634
Conley & Wirick, P.A.
31 Union Street
Bath, Maine 04530
Tel: (207) 443-3434
wwirick@conleyandwirick.com

PLAINTIFFS' CLOSING ARGUMENT