**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

|  |  |  |
|---|---|---|
| THE PINES CHURCH and MATT GIOIA | ) ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) | **Civil Action No. 1:23-cv-00214-LEW** |
| HERMON SCHOOL DEPARTMENT | ) ) ) | |
| Defendant | ) ) | |

**CLOSING BRIEF OF DEFENDANT HERMON SCHOOL DEPARTMENT**

**INTRODUCTION**

Hermon School Department Policy KG, entitled Community Use of School Facilities, provides that "[s]chool facilities should be made available for appropriate community use when such facilities are not required for their primary purposes:  the instruction of students and related school activities.  Joint Trial Ex. 1.  Pursuant to this policy, a whole host of community groups, ranging from athletic organizations like AAU Basketball, to activity organizations like the Boy Scouts, to religious organizations like the Good News Club, ask for permission to use various school facilities and permission is granted by the building principal when the requested facilities are available.  This case, however, does not involve a request for *use* of facilities; it involves a request for a *lease* of a significant portion of the Hermon High School every Sunday for a year. Because the Hermon School Committee had never leased school space before, a majority of the members of the Hermon School Department had questions about whether such an arrangement would work.  Would there be sufficient parking?  Was there adequate custodial support?  Would student activities be pushed out?  These were the questions raised during the School Committee's

discussion and the School Committee, by a vote of 4-1, decided to give it a try, and voted to give the Church a month-to-month lease.  The School Committee's decision to welcome the Church to use school facilities on a trial basis not only makes perfect sense given its obligation to make facilities available in the first instance to students, but by agreeing to lease the property at all, it also clearly shows that there was no intent to discriminate against the Church on the basis of religion.  The Plaintiffs' theory here is that because one member of the School Committee asked questions about the Church's beliefs (after having been invited by the Pastor to get to know the Church), the failure by the School Committee to vote to give the Church a long term lease must have been because of its (undisclosed) beliefs on those subjects.  The evidence at trial failed to support this theory or show in any other way that the School Department discriminated against the Pines Church and judgment should be entered in favor of the Hermon School Department.

**THE TRIAL EVIDENCE**

    1.   <u>The Facilities Use Process at the Hermon School Department</u>.

Use of facilities by outside parties is addressed in School Committee Policy KG which states that "[s]chool facilities should be made available for appropriate community use when such facilities are not required for their primary purposes:  the instruction of students and related school activities."   Joint Trial Ex. 1.  Under Policy KG, the long-term rental or lease of unused school facilities are left to the School Committee "upon the recommendation of the Superintendent."  *Id.*  The Policy also sets out guidelines for school principals who are authorized to grant "occasional or short-term use" of space in their school buildings.  Accompanying Policy KG is a Building/Facilities Request Form which groups requesting use of facilities were required to fill out and submit.  Joint Trial Ex. 2.

The trial record establishes that a number of different groups completed Building/Facilities Request Forms asking for permission to use space at one of the three schools in the District.  Joint Trial Ex. 7.  There are several requests from the Builders Club to hold periodic meetings at the Hermon Middle School after school, Joint Trial Ex. 7 at pp. HSD000143, HSD000287 HSD000339, HSD000417, HSD000419, HSD000565; there is a request from the Hermon Cub Scouts to use several rooms at the Elementary School throughout the year for cub scout den meetings, Joint Trial Ex. 7 at pp. HSD 000575, HSD000577; there is a request from the Girl Scouts to use the library after school, Joint Trial Ex. 7 at p. HSD000579; and there is a request by the Good News Club to use space at the middle school on a weekly basis to hold child evangelism fellowship.  Joint Trial Ex. 7 at p. HSD000567.  There was also testimony from several board members whose kids used facilities with outside groups.  *E.g.*  Vol. I 88:6-7[1] (rec football and team dinners), Vol. I 204:4-25 (AAU basketball).  And Micah Grant testified that his church basketball team also uses School Department facilities.  Vol. II 162:21-25.

The only person to testify at trial with any significant personal knowledge about the facilities use process was former Superintendent Micah Grant,[2] who had familiarity both as a school principal charged with granting permission for use and a private citizen requesting use. Vol. II 158:13-19.  According to Grant, important factors in assessing a request include whether the request was for use during or outside of school hours, on weekdays or weekends.  Vol. II 158-159:3. This was important, Grant explained because "the biggest part of that is the custodial

---

[1] There were two days of trial.  The transcript of the first day is referred to herein as "Vol. I" and the transcript of the secondary is referred to as "Vol. II."

[2] Although Hailey Keezer testified at length about the process, her testimony revealed that she had little actual knowledge about it.  She claimed to know about the process from her work on the PTA, but conceded that she never made a request and the process was never discussed during meetings. Vol. I 148:24-149:10. Other Committee members similarly testified to a tangential knowledge based on the fact that their children participated in activities in school space, but no one other than Grant was actually involved in the process.

coverage of that in trying to – if it's for example, if it was in the school hours then we could cover that – the cleaning afterwards.  So if it was 2:30 to 3:30, after school we already have a custodian on duty who can then continue their cleaning schedule, maybe working around that. Saturday-Sunday, you know, obviously we – we had a practice of requesting people to work overtime."[3] Vol. II 160:3 – 12.

Grant also explained the critical difference between building use granted under the facilities use procedure and a lease, that is that under the facilities use process, access to the space granted was not guaranteed.  Vol. II 162: 3- 10.  Indeed, according to Grant, someone using space under a facilities use request could get "bumped" with little or no notice if the space was need for a school event.  Vol. II 162: 8 – 22.  Moreover, "bumping" was more apt to occur for spaces like the auditorium than a classroom.  Vol. II 163:23 – 24, 165:3 – 13.

Grant testified that to his knowledge, based on working in the School Department for 15 years, the School Department had never entered into a long-term use for space in the school. Vol. II 128:8-9.  With the sole exception of Keezer, who was new to the Committee and testified extensively to a lease about which she had no personal knowledge, other Committee members who testified had a similar understanding. *E.g.* Vol. II 76:14-17, Vol. II 20:9-10.

2.  Request for a Lease by the Pines Church.

In July of 2022, Pastor Matt Gioia met Hermon School Committee member Haily Keezer at a barbeque/pool party and she recommended that he inquire about using the Hermon High School for Sunday services.  Vol. I 13: 16-19; Vol. 1 81:14-22.  At that time the Church was using space at the Spotlight Cinema in Orono under a month-to-month lease and Gioia wanted to relocate to somewhere under a one-year lease.  Gioia testified that he wanted the lease for

---

[3] The School Department could not, as a matter of contract with its staff, hire people from the outside to perform cleaning.  Vol. II 160:22-25.

"stability and certainty," Vol. I 55: 7-14.  Specifically, Gioia said he wanted to be sure the space was available every single Sunday for a year, with one "caveat"--  he knew that there would be one Sunday in the year where the school would not be available.  Vol. I 55:19-22; Vol. I 56: 35 ("one Sunday that they might have something planned and that we'd have to meet somewhere else").  Gioia understood that the date of this one Sunday would be identified for him before the lease was signed. Vol. I 56: 19-21; Vol. I 57:15-16.

Gioia reached out first to the school secretary who transmitted a rejection of his request from Principal Brian Walsh, citing lack of staffing for the decision.  Vol. I 14:14 – 15:15. Next Gioia contact Superintendent Grant, who is currently an associate pastor at the Cornerstone Baptist Church, Vol. II 124: Vol. II 11-14.  Grant reacted positively to his request, testifying that:

> I loved his vision, what he told me, his story about growing up in Maine, what he told me about Jesus, what he said regarding their heart for the community.

Vol. II 127:23-25.  Grant found Gioia to be "very persuasive and very sincere and genuine so [Grant] wanted him in front of the School Committee." Vol. II 128:4-5.  He therefore invited Gioia to attend the School Committee meeting.  His only concern "was just I wasn't aware of any one that had ever been done, so that was my only concern was just, you know, not having another model to look at to say it's been done over here or, you know over here."  Vol. II 128: 8-11.  Gioia's testimony corroborated Grant's efforts to work with him to make the application a success.  Vol. I 52:10 – 16.

Gioia attended the School Committee meeting on November 17, 2022 and made a presentation asking for a one-year lease.  Critically, he never suggested whether a shorter term would or would not be acceptable.  He talked about what the Bible says.  He told the School Committee that the Church's values are consistent with their values.  And he invited the School Committee to come to the Church to get to know them.  Joint Ex. 6; Vol. I 61:16-19.

Shortly after the meeting, School Committee member Chris McLaughlin followed up with some questions about the Church.  His purpose for doing so, he testified, was as follows:

> My motivation at the time for reaching out to Pastor Matt was to – to connect and to – out of curiosity and to learn more about his church, which was an invitation we received that night at the school board meeting."

Vol. II 91:22-25.

Gioia first attempted to deflect the questions, telling McLaughlin that communication should go through the Superintendent, and then when the Superintendent forwarded them to him, he simply ignored the questions altogether.  No one followed up. Vol. I 63:3- 8.

The matter of the lease came up for vote on December 12, 2022.  There was no evidence introduced at trial to suggest that the School Committee members spoke about the issue among themselves between meetings.  There was similarly no evidence that anyone other than Keezer knew about the questions McLaughlin had asked.  The entire meeting is captured on video and the entire discussion of the board is in evidence and thus all discussion between Committee members is available for review.

Consistent with their practice, the School Committee invited the Building Principal, Brian Walsh, up to the podium to talk.[4]  Contrary to what Plaintiffs state, he did not say advocate against leasing space to the Church.  Rather, he spoke about the staffing issues in response to a question from Keith and he urged the Board to be careful to make it clear in the lease that the High School was not sponsoring a church.  In other words, Walsh's comments to the board assumed that the School Committee would lease space to the Church, he just wanted the roles of Church and school to be kept distinct.  Joint Trial Ex. 6.

---

[4] Committee Chair Keith testified that the School Committee often invites input from administrators at its meetings. By contrast, no member of the public is permitted to participate unless they are on the agenda.  His testimony is undisputed. Vol. II 22:2- 6.

3.      School Committee Votes to Grant a Month-to-Month lease

After discussion, the Chair asked for a motion and Shorey moved to give the Church a 6 month lease.  Her motion failed for lack of a second and then Oiler moved to give the Church a month-to-month lease.  Oiler, Shorey, Keezer and Keith voted in the affirmative for that motion and it passed. Joint Trial Ex. 7.

The five members of the School Committee who voted on the Church's request for a lease described their reasons for voting as they did as follows.

- Hailey Keezer: Keezer suggested that Gioia rent the space and was an obvious strong supporter of him throughout the trial.  She did not move to grant the Church a one-year lease and she did not second the motion to grant it a 6 month lease[5] but there is no contention that she was motivated by discriminatory animus.

- Jesse Keith: Keith testified that "my primary concern was ensuring that the facility was open to our students first and foremost, whether it be for practices or band or shows or other clubs.  And there had already been communication that there would be conflicts.  Never having had a long-term lease in my six years, I was concerned that signing a year-long lease or agreeing to a year-long lease could create challenges where we weren't prioritizing the facility for our children.  Vol. II 23:23- 24:5.  Keith further testified that at the start of the meeting he was open to a discussion of a 6 month lease (i.e. he had no discriminatory views about the Church using the property) but after listening to concerns about foot traffic and parking he decided that a month-to-month lease would be "better

---

[5] Keezer claimed she was confused which was why she did not move to give the Church a longer lease.  Minutes in evidence reflect that Keezer knew well how to move and second motions during meetings.  Joint Trial Ex. 3 at pp. HSD0004, HSD0006, HSD0007; Joint Trial Ex. 4 at pp. HSD00070, HSD00071.

suited for the school and for our children." Vol. II 24:8 - 14. For him, the month-to-month arrangement "would give us an ability to see if those – the concerns that I had around the facility being open to our children first, around custodial staff, if those were concerns that we could rectify or if they were challenges that were going to become a bigger problem." Vol. II 24:18-22.

- Kristin Shorey. Shorey, like Keith, had concerns about the one-year lease proposal because it had never been done before. Vol. II 77:18-21. She had no objection to the fact that the Pines Church was a Church but rather was concerned about the length of time of the proposed lease. Vol. II 77:3 – 5. She ended up moving to grant the Church a 6 month lease in order to "give it a try." Vol. II 77:1-2. She also voted in favor of the motion to grant the Church a month-to-month lease. Joint Trial Ex. 4 at p. HSD0004.

- Stephanie Oiler: Oiler's concerns, articulated during the meeting and reiterated in her testimony in court, centered around parking and custodial issues. Like Shorey, she clearly held no animus to the Church because she moved to grant it a month-to-month lease. Joint Trial Ex. 4 at p. HSD0004.

- Chris McLaughlin: McLaughlin is the only School Committee member who voted not to grant the Church any lease. Although Plaintiffs went to great lengths to establish that his views differed from those of the Church on various social issues, there was no evidence to establish that this was the reason for his vote. His question at the board meeting focused on whether renting to the Church was aligned with the School Committee's budgetary goals. He did not reference the Church's views on controversial topics. Moreover, after asking about these views and not getting an answer, he never followed up, which is evidence of the lack of importance he placed in the information.

Gioia declined the invitation to rent space at the High School on a month-to-month basis but instead asked the Superintendent if the School Committee would consider a 6 month lease. Gioia also apparently explained to Grant (but not the School Committee) the logistical challenges a month-to-month lease would pose.  After speaking with the Chair, Grant informed Gioia that under the Committee's rules a motion and vote must wait 90 days before being taken up again. Plaintiffs' Trial Ex. 6 at p. TPC000120.   Grant went on to acknowledge Gioia's logistical concerns but assured him that "you would be working with me directly, in regards to the lease terms and renewal(s) which I believe would be logistically adventagious in the future." *Id.*  He also encouraged Gioia to move forward with the lease that had been offered. *Id.*  Gioia chose not to do so and also not to pursue his request for reconsideration of a 6 month lease after the 90 days passed.  Vol. I 66:17-19.

**THE APPLICABLE LEGAL FRAMEWORK**

Plaintiffs have asserted three federal claims and one state law claim. [6]  The applicable standards for those claims is as follows.

1.        <u>The Standard Applicable to Federal Claims</u>

As explained in this Court's decision on the motions for summary judgment, "[t]he common question within Plaintiffs' three constitutional claims concerns the requirement of government neutrality toward religion and whether the School Committee refused to offer Plaintiffs a lease because of their religious views." ECF Doc. 51, PageID#: 909. The First Circuit's decision in *Scott-Harris v.  City of Fall River,*  134 F.3d 427 (1st Cir. 1997) *rev'd on other grounds sub. nom. Bogan v. Scott Harris,* 520 U.S. 1263 (1997) is instructive on Plaintiffs'

---

[6] There are two Plaintiffs in this case, the Pines Church and Matthew Gioia.  Gioia conceded that he did not ask for a lease on his own behalf and there was no evidence introduced nor argument presented in Plaintiffs' closing brief to support any claim by him against the School Department.

9

burden on their federal law claims.  In particular, the First Circuit "assume[d] for argument's sake (but [did] not decide)," *id.* at 438[7], that the standard for municipal liability imposed on a governmental entity to prove Section 1983 liability under *Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658 (1978) "in a sufficiently compelling case," could be as follows:

> the requirement that the plaintiff prove bad motive on the part of a majority of the members of the legislative body might be relaxed and a proxy accepted instead. Nevertheless, any such relaxation would be contingent on the plaintiff mustering evidence of both (a) bad motive on the part of at least a significant bloc of legislators, and (b) circumstances suggesting the probable complicity of others.

*Id*. The key, the First Circuit explained, is whether the plaintiff has proffered evidence that "makes it appear more probably (i.e. more likely than not) that discrimination was the real reason" for governmental action.  *Id.*

The First Circuit did not explain in *Scott-Harris* what circumstances would make a case sufficiently compelling but there is nothing compelling about this case.   As discussed more fully below, Plaintiffs point to no evidence whatsoever to suggest complicity between Committee members and other than wild speculation, they offer no evidence to support bad motive on behalf of a "significant bloc" of the 5 voting members of the School Committee.

    2.    <u>The Standard Applicable to State Claims</u>

Plaintiffs bring their state law claim under the public accommodations section of the Maine Human Rights Act ("MHRA") which provides, in relevant part, that it is unlawful public accommodation discrimination:

> to discriminate against or in any manner withhold from or deny the full and equal enjoyment to any person, **on account of** . . . religion . . . any of the accommodations, advantages, facilities, goods, services or privileges of public accommodation, or in any manner discriminate any person in the price, terms or conditions upon which access to accommodations, advantages, facilities, goods, services and privileges may depend."

---

[7] In their Closing Brief, Plaintiffs blow right by this language and characterize this as "the First Circuit's standard." ECF Doc. 150, PageID#: 2087.

5 M.R.S. § 4592 (emphasis added).

As this Court correctly noted in ruling on the motions for summary judgment, there are no decisions of the Maine Law Court directly setting forth the standard for liability of a municipal body under the MHRA. The Maine Law Court has, however, repeatedly held that "because the MHRA generally tracks federal anti-discrimination statutes, it is appropriate to look to federal precedent for guidance in interpreting the MHRA." *Winston v. Me. Technical Coll. Sys.,* 631 A.2d 70, 74–75 (Me.1993); *see also Doyle v. Dept of Human Services,* 2003 ME 61, 824 A.2d 48, 54.

> In analyzing a claim under Title VII, the United States Supreme Court has explained:
>
> Most notably, the statute prohibits employers from taking certain actions "because of" sex. And, as this Court has previously explained, "the ordinary meaning of 'because of' is 'by reason of' or 'on account of.' " *University of Tex. Southwestern Medical Center v. Nassar*, 570 U.S. 338, 350, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013) (citing *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009); quotation altered). In the language of law, this means that Title VII's "because of" test incorporates the " 'simple' " and "traditional" standard of but-for causation. *Nassar*, 570 U.S. at 346, 360, 133 S.Ct. 2517. That form of causation is established whenever a particular outcome would not have happened "but for" the purported cause. See *Gross*, 557 U.S. at 176, 129 S.Ct. 2343. In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause.

*Bostock v. Clayton Cnty., Georgia,* 590 U.S. 644, 656. (2020). Because the MHRA uses the phrase "on account of," federal precedent suggests that the proper analysis here is whether but for the Church's religion, it would have received the one-year lease it requested. "[P]ut differently, if changing the [Plaintiffs' religion] would have yielded a different choice []—a statutory violation has occurred." *Id.*

Plaintiff's Closing Brief includes no analysis of the proper standard for their state law claim but instead assumes the appropriate standard is that articulated by the Maine Law court in *Walsh v. Town of Millinocket*, 2011 ME 99, 28 A. 3d 610. Plaintiffs assert that under *Walsh,*

11

discriminatory animus on the part of even a single decision maker is sufficient to impose liability.  ECF Doc. 150, PageID#: 2104.  That, however, is an oversimplification of what the *Walsh* court held.  In *Walsh,* there was evidence that one Town Council member acted with discriminatory animus.  The Law Court held that under  the so-called "cat's-paw" theory that had recently been explicated by the U.S. Supreme Court in *Staub v. Proctor Hosp.,*  562 U.S. 411 (2011),  "if the plaintiff demonstrates that the agent with an improper motive influenced the ultimate decision-maker's decision, the agent's improper motive may be imputed to the ultimate decision-maker, thereby establishing a causal link between the protected activity and the adverse employment action." 2011 ME 99, ¶ 22, 28 A.3d at 616.   In other words, showing animus on the part of a single member of the School Committee is sufficient only when accompanied by evidence that that animus influenced others.

In this case, regardless of what standard the court adopts, there was simply no evidence to support Plaintiffs' public accommodations discrimination claim.

## DISCUSSION

1.      Plaintiffs Did Not Prove That The Hermon School Department Discriminated
        Against The Church on the Basis of Religion

All four of Plaintiffs' claims are grounded in the assertion that the Hermon School Department discriminated against the Church on the basis of religion.  As the United States Supreme Court has explained, to discriminate means:

> To make a difference in treatment or favor (of one as compared with others)." Webster's New International Dictionary 745 (2d ed. 1954). To "discriminate against" a person, then, would seem to mean treating that individual worse than others who are similarly situated. See *Burlington N. & S. F. R. Co. v. White*, 548 U.S. 53, 59, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

*Bostock,* 590 U.S. at 657.  Plaintiffs' claims here fail right out of the box because it cannot point to an entity that is similarly situated.  The Church was the first organization ever to ask for a one-

12

year lease of school facilities so there was no evidence that they were treated differently than others who were similarly situated.

In their Closing Brief, Plaintiffs attempt to get around this glaring failure in their claims in two ways, both of which are based on mis-citations to the record. First, Plaintiffs argue that they are similarly situated to the community groups that utilized the Facilities Use process to use space in various schools in Hermon. What Plaintiffs ignore, but what was made crystal clear during the trial, is that the Facilities Use process is vastly different from a lease. Under the Facilities Use process, organizations are subject to bumping, something that is not true of a lease and, critically something that was unacceptable to Pastor Gioia who was looking for "stability and certainty," Vol. I 55: 7-14. As he testified:

Q. And you need to be sure that the property is going to be available for you every single Sunday in the year that wanted to be there, correct?
A. That is correct. With one caveat. Can I say one caveat?
Q. Is it correct or not? If it's not correct, just tell me.
A. Well, he mentioned there may come a time that we had something planned, that it would be few and far between. He actually mentioned it in the video. So to say that we would have the full year, I knew that there was a potential of one Sunday that they might have something planned and that we'd have to meet somewhere else.

Vol . I 55:19-56:4. There can be no doubt here that the Church was not in the same status as those who used facilities as they were available under the Facilities Use process.

Second, pointing to references in school board meeting minutes, Plaintiffs' Trial Ex. 3 at pp. TPC00095, TPC00099, Plaintiffs claim that there were in fact other leases that the School Committee had granted to outside parties. This however ignores the undisputed testimony that those leases referred to arrangements where the School Department was the lessee, not the lessor.

13

Vol. II 166:23- 167:4; 167:19- 168:1.[8] In the end, then, there was no evidence that there were any similarly situated entities and thus no evidence that the Church was treated differently.

And even further than that, the fact is that the Church was given a lease – albeit not for the term it wanted – by a majority of the School Committee which is strong proof that there was no intent on the part of the Committee to exclude the Church on the basis of its religion. [9] Plaintiffs assertions that the School Committee was motivated by animus are not supported by the record.

  2.  Plaintiffs Failed to Show Discriminatory Animus on the Part of the School Committee

In their Closing Brief, Plaintiffs paint their allegations of discriminatory animus with a brush so broad it defies logic. They assert that *every* School Committee member other than Haily Keezer "declined to support any meaningful rental arrangement, effectively foreclosing the Church's ability to use the facility." ECF Doc. 150, PageID #: 2088. They even take aim at Kristin Shorey, the Committee member who moved to give the Church a 6 month lease, asserting that she was motivated by animus toward the Church. This contention, of course, makes no sense whatsoever. After all, if Shorey objected to having the Church rent space in the High School for a year because it was a church or because of its religious ideology, why would she have been content to have it rent space in the High School for 6 months?

---

[8] Plaintiffs also make a weak attempt to rely on Keezer's testimony regarding a broadband lease notwithstanding that Keezer was not on the School Committee when it was entered into. She merely testified that the contract was revised to reflect a name change and was brought to the School Committee at that time. Vol. I 143:10-25.

[9] In their Closing Brief, Plaintiffs attempt to avoid the obvious conclusion that School Committee members who voted to give the Church a month-to-month lease could not have sought to exclude it because of religion by characterizing any alternative to the one-year lease Gioia requested as not being meaningful and thereby foreclosing the church's ability to use the space. However, Plaintiffs point to no evidence to suggest that anyone on the School Committee believed that to be true. Indeed, all indications were to the contrary: Gioia never told the School Committee that anything short of a year long lease would be unworkable, Gioia later conceded that a 6 month lease would be acceptable, and the Church was then operating under a month-to-month lease. It was entirely reasonable to believe that the month-to-month trial would be an acceptable solution for all parties.

Plaintiffs do not even attempt to explain how Shorey could have been motivated by discriminatory animus in moving to give the Church a 6 month lease.  Instead, they begin by faulting Shorey for testifying to some "apprehension" to giving the Church a one-year lease. Specifically, Plaintiffs argue that "she acknowledged personal apprehension' about a church using school facilities, an apprehension she attributed solely to the fact that a church had not previously made such a request." ECF Doc. 150, PageID#: 2093.  Plaintiffs statement, however, is not an accurate representation of Shorey's testimony.  Rather, Shorey explained as follows:

> Q .     Were you apprehensive because a church had never requested a long-term lease or no one to your knowledge had requested a  long-term lease?
> A.      No one to my knowledge.
> Q.      And what was it that gave you some apprehension there?  Was it just that you didn't know how it would work out?
> A.      I didn't know, right, how – what the process was.  I had not experienced it myself.

So, Shorey explained, she proposed 6 months to "give it a try."[10] Vol. II 77:1-2.

In another example of laying blame at their clear supporters, Plaintiffs devote an entire section of their closing to an argument that Superintendent Grant acted in a discriminatory manner toward the Church because he arranged to have Gioia present to the School Committee rather than use the facilities use request process.  Putting aside that there can be no serious dispute  here that Superintendent Grant was the Church's biggest proponent and the evidence was overwhelming that he supported the Church's application and was supportive of Pastor Gioia (something that even Gioia conceded), it is indisputable that the Facilities Use process did not apply because Gioia was not looking to use the facilities, he was looking to rent them.  *See* Joint Trial Ex. 1 ("The long-term rental or lease of unused school facilities shall be authorized by

---

[10] It bears noting that Plaintiffs' characterization of Shorey's proposal for a 6th lease as not being a "meaningful rental arrangement" is inconsistent with their contention that the School Committee should have considered Gioia's after-the-fact request for a 6 month lease.

the Hermon School Committee upon the reaccommodation of the Superintendent of Schools. The occasional or short-term use of school facilities shall be authorized by the school principal").

Plaintiffs also attempt to turn a memorandum prepared by legal counsel advising the School Committee that it is permissible to rent school facilities to a church and impermissible to refuse to do so because of its religious status (Defendant's Trial Ex. 1) into evidence of bias on the part of the School Committee. The memorandum is, however, completely neutral. Moreover, Plaintiffs' contention that "[r]ather than requesting balanced, neutral guidance on how to apply Policy KG and the first Amendment to a religious organization's request for equal access, counsel was asked and provided a narrow opinion framed entirely in the negative," ECF Doc. 150, PageID#: 2095, is nowhere supported in the trial record.

And Plaintiffs' attacks on Oiler and Keith fare no better. Here they rely once again on mischaracterizations of testimony by, for example, claiming that Oiler asked if it was "normal" to rent to a church when in fact she asked if the term of the proposed lease was normal. Vol. I 171:19-25. And they fault both Oiler and Keith for failing to investigate whether their logistical concerns were justified. It is, however, not whether the concerns were justified that is relevant but rather whether they were genuine. Here, given that the Church was asking for a significant amount of space for a significant duration on Sundays when, as Plaintiffs themselves point out in their Closing Brief, the space was often in use by other groups, there can be no question but that they were.

To be sure, the Hermon School Department acknowledges that this Court, as factfinder, could find that McLaughlin was motivated by discriminatory animus in voting against the month-to-month lease. Or it could accept McLaughlin's testimony that he asked the questions in response to Gioia's invitations and did not follow up to obtain answers because the answers did

16

not matter to his decision.[11]  But in the end, how the Court resolves this credibility issue is immaterial because:  (1) McLaughlin was only one vote in five and four School Committee members voted to have the Church rent space at the High School; and (2) there is no evidence at all that McLaughlin had any effect on the votes of other Committee members.

        3.        <u>Plaintiffs' Unsubstantiated Accusations of General Religious Bias Should Be Ignored</u>

Finally, Plaintiffs invite this Court to engage in rank speculation, arguing that the Hermon School Department is unfriendly to religion – and therefore the School Committee members acted with discriminatory animus --  because Keezer and Grant, whom they characterize as "the only self-identified Christians who participated in the rental process," " were both subjected to ostracism."  ECF Doc. 150, PageID# 2102.  In the first place, Plaintiffs did not establish that Keezer and Grant were the only Christians involved in the process.  Rather, other than McLaughlin, they simply did not ask any School Committee member but Keezer about their religious beliefs.  It is as likely as not that one or more of them share the beliefs of Keezer and Grant, the employee who was hired and worked for the School Department for a decade.

Secondly, although the trial testimony does support the notion that many of her fellow School Committee members did not communicate regularly with Keezer, there is no evidence that this was any different than the way they acted toward each other or that their relationship with Keezer was because of her religious beliefs.

Nor was there any evidence that Grant was ostracized.  Plaintiffs' attempts to characterize Grant's comments about feeling as if he was "Daniel in Babylon" as an admission of a tension between his beliefs and district policy, ECF Doc. 150, PageID#: 2097, is a brazen

---

[11] Indeed, there is certainly an argument here that Gioia set McLaughlin up by speaking about his beliefs as to what God has said, asserting that the Church's values are in line with those of the School Department and inviting the School Committee members to get to know the Church, only to fault McLaughin for doing exactly what he asked.

mischaracterization of the record.  What Grant testified to very clearly was that his disagreement was with the Maine Department of Education, not the Hermon School Department:

> So from just purely a theological standpoint, when you work at least, you know, as a Christian, a born-again Christian, I think sometimes your beliefs don't align with certain policies or practices through the Maine Department of Education.

Vol. II 155: 20-24.

## CONCLUSION

Neither the First Amendment of the United States Constitution, nor the Maine Human Rights Act guarantee a religious organization the right to rent space in a public school.  Rather, religious organizations, just like their secular counterparts, are entitled only to have what is available, subject to the needs of the students and school community.  The Pines Church, like every other organization in the area, was free to use space in the Herman High School if that space was available.  It could have done that through the Facilities Use process used by other organizations, or it could have availed itself of the month-to-month least the Hermon School Committee offered but that is not what it wanted.  But it wanted the certainty and stability of a long term lease – something that the Hermon School Department had not done before and something that its School Committee was not willing to do without a trial period. The School Committee's decision was not unlawful, it was a reasonable exercise of discretion.  This Court should enter judgment in favor of the Defendant.

Dated: April 15, 2026

/s/ *Melissa A. Hewey*
Melissa A. Hewey
Attorney for Defendant Hermon School Department
Drummond Woodsum
84 Marginal Way, Suite 600
Portland, Maine 04101-2480
Tel:  (207) 772-1941
Fax:  (207) 772-3672
mhewey@dwmlaw.com

18

Case 1:23-cv-00214-LEW    Document 151    Filed 04/15/26    Page 19 of 19    PageID #: 2124