# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MAINE

| | |
|---|---|
| **THE PINES CHURCH**, a Maine non-profit corporation; **MATT GIOIA**, an individual;<br><br>Plaintiffs,<br><br>vs.<br><br>**HERMON SCHOOL DEPARTMENT;**<br><br>Defendant. | Civil Action No.:  1:23-cv-00214-LEW<br><br>**PLAINTIFFS' CLOSING ARGUMENT REPLY** |

Defendant's Closing Brief attempts to recast a clear case of religious discrimination as a routine administrative decision driven by neutral "practical concerns." It minimizes the invasive belief-based questioning and ignores the unprecedented procedural hurdles, pretextual logistical excuses, and disparate treatment that emerged at trial.[1] The record, however, overwhelmingly establishes that the Committee denied The Pines Church a meaningful (six-month or one-year) rental use arrangement because it is a church. This violates the First Amendment and the Maine Human Rights Act.

## I. THE EVIDENCE ESTABLISHES DISCRIMINATORY ANIMUS BY A SIGNIFICANT BLOC (AND MAJORITY) OF THE SCHOOL COMMITTEE

Defendant asserts that Plaintiffs "paint their allegations of discriminatory animus with a brush so broad it defies logic" and that only McLaughlin acted with improper motive. Def. Br., p. 14. This is incorrect. The trial evidence demonstrates bad motive on the part of at least a significant bloc, and in fact a majority, of the five voting members, satisfying both the First Circuit's relaxed standard in *Scott-Harris v. City of Fall River*, 134 F.3d 427 (1st Cir. 1997), and Maine's "motivating factor" standard under *Walsh v. Town of Millinocket*, 28 A.3d 610 (Me. 2011).

To begin, Defendant claims Oiler's questions were merely about whether the *term* of the lease was "normal" and accuses Plaintiffs of mischaracterizing the testimony. (Def. Br., p. 16, citing Tr. Vol. I 171:19-25.) The full context shows otherwise.[2] At no point in the exchange was term length discussed. At trial, when questioned about this exchange, it was clarified that she was not asking about the term of the lease.[3] Nowhere in these exchanges does Oiler express concern about the term length (nor is there any preceding discussion regarding term length). At a *later* meeting, Oiler did ask about lease terms,

---

[1] Not surprisingly, Defendant relies on repeated ad hominem attacks in an effort to divert attention from the absence of substantive argument. To begin, the disdain for the Church is made even more apparent by Defendant's attempt to lay blame *on* Pastor Gioia: "There is certainly an argument here that *Gioia set McLaughlin up* by speaking about his beliefs as to what God has said." *See* ECF No. 151, Defendant's Closing Argument, p. 17 ("Def. Br.") (emphasis added). Throughout its brief, Defendant characterizes Plaintiffs' allegations as "so broad [as to] defy logic" (*id.*, p. 14), dismisses their position as making "no sense whatsoever" (*id.*), asserts that they offer "no evidence" beyond "wild speculation" (*id.*, p. 10), criticizes their reliance on Keezer's testimony as "weak" (*id.*, p. 14), claims Plaintiffs "invite this Court to engage in rank speculation" (*id.*, p. 17), accuses them of "blow[ing]" past applicable law (*id.*, p. 10), and describes their interpretation of the record as a "brazen mischaracterization" (*id.*, pp. 17-18). This approach weakens Defendant's argument because it replaces analysis of the evidence with rhetorical attacks and does not engage the merits of Plaintiffs' claims or the evidentiary record.

[2] Jnt. Ex. 5 at 47:19-47:53 (**Oiler:** "My question is for Mr. Grant. Is this a normal type of lease that public school systems do?" **Grant:** "So, when you say "normal," statewide, I don't know. Obviously, the town of Hamden has recently rented out the Old Hamden Academy to Rock Church. That is something I will certainly look into in the next 30 days to see what other schools have this. You know, I have the Superintendent's Network that I can reach out to.").

[3] Tr. Vol. I 173:9-11 (**Plaintiffs' Counsel:** "In his response to you, he didn't mention anything about the lease term or length, correct?" **Oiler:** "Correct." **Plaintiffs' Counsel:** In his response he mentioned another church, correct?" **Oiler:** "He did, correct. **Plaintiffs' Counsel:** "And you didn't clarify that you were asking about the term length, correct?" **Oiler:** "Correct.").

questioning whether the Department ever does "shorter leases, for instance, six months."[4] After Grant confirmed six-month leases were "very common" and all her logistical concerns were resolved, she nevertheless moved for the illusory month-to-month lease.[5] Oiler never investigated her own concerns, never contacted custodians, and admitted she did not know the High School's parking capacity.[6]

Defendant defends Shorey's 6-month motion as proof of no animus. Def. Br. at 14-15. Defendant again accuses Plaintiffs of inaccurately representing the testimony (Def. Br. at 15), but Shorey herself testified to "apprehension" about a church using school facilities, apprehension she attributed to the fact that no church had previously made such a request.[7] In any event, the very offer of a six-month arrangement by a committee member is itself problematic, because short-term rental arrangements were not within the committee's prerogative.[8] She further admitted McLaughlin's belief-based questions "would not be expected" of secular groups like Hermon Rec or basketball programs "[b]ecause Hermon Rec is not a church," while implicitly suggesting that such questioning would be expected of The Pines Church precisely because it is one.[9] She raised insurance and snow-removal concerns that Grant immediately resolved, yet still refused the one-year term she knew was requested.[10]

As Chair, Keith orchestrated procedural irregularities (silencing Pastor Gioia despite his presence on the agenda, inviting only Walsh to speak,[11] seconding the unauthorized month-to-month motion) while ignoring Keezer's repeated warnings of differential treatment and potential liability.[12] He further disregarded Grant's assurances on logistics and denied any further consideration of a six-month rental use arrangement.[13]

The month-to-month "lease" Defendant touts as proof of no discriminatory intent (Def. Br. at 14)

---

[4] Jnt. Ex. 6 at 59:43.

[5] Jnt. Ex. 6 at 59:50-1:00:15, 1:05:39-1:06:17; *id.* at 58:56–59:12; 1:00:15–1:01:10; 1:01:40–1:02:32; Tr. Vol. I, 184:9-17, 160:13-18, 162:10-12.

[6] Tr. Vol. I 179:5-6, 187:25-188:4.

[7] Tr. Vol. II 54:22-55:5 (**Plaintiffs' Counsel:** "And that apprehension is because a church had never requested prior to use school facilities?" **Shorey:** "Correct.").

[8] Jnt. Ex. 1, p. 1; Tr. Vol. I, 164:2–9.

[9] Tr. Vol. II 56:20-57:3, 58:1-8.

[10] Jnt. Ex. 6 at 1:04:43-1:05:39; Tr. Vol. II 53:11-17, 54:18-21.

[11] Defendant contends that "no member of the public is permitted to participate unless they are on the agenda." Def. Br., p. 6, n.4. Here, however, Pastor Gioia's rental use request was on the agenda (Jnt. Ex. 4, pp. 3-4), making it unclear why he would not have been permitted to address the Committee in connection with that item, especially when invited to speak by a voting Committee member (Keezer) (Jnt. Ex. 6, 1:07:20; 1:21:49).

[12] Jnt. Ex. 6 at 1:07:20, 1:21:49; Plt. Ex. 5 at pp. 3, 9-10; Tr. Vol. I 114:8-117:4, 129:22-132:25.

[13] Tr. Vol. I 199:8-10; Plt. Ex. 6, p. 24.

was, as Pastor Gioia testified, "a no wrapped in a yes," illusory, and unacceptable for the stability the Church required.[14] Pastor Gioia never told the Committee a shorter term was unworkable before the Committee's vote because he was never asked and did not have any reason to believe the one-year rental use request was inoperable. He later requested a six-month rental use arrangement, but was still denied.[15] Offering an inferior alternative does not negate animus when the denial of equal terms was driven by religion. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993) ("Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality.").

By Defendant's own admission, "permission [to use various school facilities] is granted by the building principal when the requested facilities are available." Def. Br., p. 1. Yet, Defendant offers no evidence of any conflicts with the facilities that should result in a denial of a six month or one year rental use request. In fact, the Superintendent, who is knowledgeable of staffing needs and conflicts, confirmed he wouldn't have brought the use request if there was a conflict.[16]

## II. THE DISTINCTION BETWEEN "FACILITIES USE" AND A LEASE IS ARTIFICIAL

Defendant repeatedly emphasizes that the Church sought a "lease" while others used the Facilities Use process. Def. Br. at 1-3, 12-13. This distinction collapses under the evidence. Policy KG expressly authorizes *both* short-term use *and* long-term rental/lease.[17] Defendant concedes that other secular groups were permitted to use school facilities (Def. Br., p. 3), but notably omits that those arrangements extended for periods of up to nine months or, in some cases, had no defined end date.[18] Other long-term arrangements existed, including a 20-year broadband lease,  a two year, and a long-term leases approved unanimously.[19]

---

[14] Tr. Vol. I 42:9-13. Defendant emphasizes that Plaintiffs' prior arrangement at the movie theater was month-to-month; however, as Pastor Gioia testified, the agreement with the theater was for an indefinite term. Tr. Vol. I 11:22-24.

[15] Plt. Ex. 6, p. 24.

[16] Jnt. Ex. 6, 1:00:15–1:01:10 (**Grant:** "Yeah, I wouldn't bring it to you if there was an already in place scheduled organization. . . . So the space that they are using, will they be in here at the same time? Yes. But will they be conflicting for this space? No."); Tr. Vol. II, 115:4–20.

[17] Jnt. Ex. 1.

[18] Tr. Vol. II, 120:23-121:3-17, 122:16-25, 123:1-11, 123:12-15, 123:16-20; Jnt. Ex. 7, pp. 8, 12, 16.

[19] Tr. Vol. I 143:10-25; Plt. Ex. 3 at pp. 1, 4, 7, 9. Defendant asserts that the year-long leases were merely internal arrangements in which the School Defendant acted as the lessee. Def. Br. at 13. The record does not support that characterization. *See, e.g.*, Plt. Ex. 3, p. 9 ("Approval of lease agreement with EMCC [Eastern Maine Community College] for the Innovative School."). The evidence shows that the Committee itself voted to approve the lease arrangements. Plt. Ex. 3 at 1, 4, 7, 9. If anything, the Committee's prior willingness to grant a year-long lease to a school entity, but not to a Church entity, only reinforces Plaintiffs' claims.

Defendant argues that "[w]hat Plaintiffs ignore, but what was made crystal clear during the trial, is that the Facilities Use process is vastly different from a lease." Def. Br., p. 13. If so, it is difficult to reconcile why Plaintiffs' six-month facility use request was presented to the Committee chair in the first instance and ultimately rejected. Defendant offered no explanation or any evidence that other applicants were subjected to a similar process. Then the record instead shows that Defendant treated Plaintiffs' request differently at every stage: first by rejecting a "lease" request, and then by subjecting a comparable six-month facility use request to an extended, multi-step process marked by delays and denial.

The "bumping" risk Defendant highlights (Def. Br., p. 13) was never an issue for Plaintiffs: Pastor Gioia understood that school activities would take priority and that the Church would share space. Defendant attempts to narrow Pastor Gioia's testimony by suggesting he was aware of only a single Sunday conflict, but that characterization misstates the record. Pastor Gioia explained that Grant had advised him there "may come a time" when Hermon had something scheduled, but that such instances would be "few and far between."[20] At the committee meeting, Grant confirmed to the Committee that, in the event of a conflict, the school's needs would take precedence and that this understanding would be incorporated into the agreement:

> **Grant:** And school does take priority although we obviously don't have very many, we do have a theater play, and *so Pastor Gioia knows that on those few Sundays where there is a school conflict, the school has, and that would be put in the agreement*, the school would have priority to use that particular space. We would try to accommodate them obviously, but we would make sure that the school has priority.[21]

Grant further acknowledged that he would not have presented the request if conflicts were anticipated.[22]

Against this record, Defendant's reliance on a formal "lease versus use permit" distinction is a post hoc rationalization rather than a consistent or meaningful basis for differential treatment. If Defendant's position were truly that a one-year term converts an application into a lease, then Paster Gioia's request for a six-month use request should have been treated similarly to the other comparable multi-month and open-ended arrangements previously approved without Committee involvement. The meeting records further underscore this inconsistency, reflecting that the Department previously leased space. Read as a whole, the record calls into question the legitimacy of Defendant's asserted distinction.

---

[20] Tr. Vol. I 55:24-56:5.
[21] Jnt. Ex. 6 at 1:01:10 (emphasis added).
[22] Jnt. Ex. 6 at 1:00:15–1:01:10.

### III. THE COMMITTEE'S LOGISTICAL CONCERNS WERE PRETEXTUAL AND ADMINISTRATORS FACILITATED THE DISCRIMINATORY PROCESS

Defendant claims the concerns about parking, custodial support, and student activities were "genuine." Def. Br., p. 16. However, Plaintiffs need only show that it is more likely than not that these were not genuine concerns. That standard is satisfied here. It is more reasonable to credit Grant's representations that these issues were not obstacles, as he directly conveyed to committee members, than to accept Defendant's post hoc assertion that they were, particularly where the record contains no contemporaneous evidence supporting those purported concerns. Grant resolved every concern on the record: the Church would pay for staff and cleaning; custodians are available; no conflicts existed; school needs took priority; parking was not an issue.[23] Committee members never investigated their purported concerns.[24] If the concerns were genuine, Defendant offers no plausible explanation for why the Church could not use the school facilities for six months or even a year once each of those concerns had been resolved. The only plausible explanation is that the Committee did not want to share its space with a church.

Further, Grant incorrectly told Pastor Gioia that the six-month request was barred by the 90-day rule and refused to refer it for administrative short-term approval.[25] Defendant presented no evidence that any other group was subject to a comparable waiting period before requesting a short term rental request. In practice, Plaintiffs' initial request took from September to December to reach a decision following Pastor Gioia's submission, resulting in an effective delay of approximately seven months before a determination was made.

Defendant steered the Church into an unprecedented process:[26] requiring written proposals and oral presentations never imposed on others, forwarding McLaughlin's belief-based questions (and reformatting them to make them easier to answer), rejecting comments from Pastor Gioia, and Walsh injecting fear-of-association warnings about the school being linked to the Church's "different beliefs."[27] These administrators did not neutrally apply policy; rather, they facilitated discrimination.

---

[23] Jnt. Ex. 6 at 58:56-59:12, 1:00:15-1:02:32.
[24] Tr. Vol. I 187:25-188:4; Tr. Vol. II 17:24-18:2.
[25] Plt. Ex. 6, p. 24.
[26] Defendant concedes that the Superintendent and Committee had discretion in this process. Def. Br., pp. 2, 18. But that discretion is not unlimited. It is well established that a policy granting officials unfettered discretion over activities protected by the First Amendment is unconstitutional. *Kunz v. New York*, 340 U.S. 290, 294 (1951); *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 763–64 (1988).
[27] Jnt. Ex. 6 at 1:11:33-1:16:06; Plt. Ex. 6 at pp. 13-15, 22-23; Tr. Vol. II 134:7-136:19.

Defendant claims it was willing to give the Church a "try" by offering a month-to-month arrangement. Def. Br. at 2. That "try" might be reasonable if there were legitimate staffing issues, scheduling conflicts, or other operational concerns affecting the school—but Grant informed the Committee none of these obstacles existed prior to its vote.[28] Defendant claims it welcomed "the Church to use school facilities on a *trial* basis." Def. Br., p. 2 (emphasis added). Defendant, however, did not present any evidence or testimony that it required other groups to go through the additional step of having a "month-to-month *trial* basis" before allowing any rental use arrangement (including those that have used the facilities for six-plus months). Offering a month-to-month lease in response to a request for a one-year term is not a meaningful accommodation nor is it consistent with what all other organizations were permitted.[29] *See Lukumi*, 508 U.S. at 534.

### IV. THE RECORD DEMONSTRATES CONSCIOUSNESS OF DISCRIMINATION

Defendant dismisses evidence of ostracism of Keezer and Grant as "rank speculation." Def. Br., p. 17. It is not. Keezer, the only member who consistently supported access and the only self-identified Christian on the Committee, was excluded from key emails, denied the opportunity for Pastor Gioia to speak, and had her agenda requests refused.[30] Private texts mocked her as "so dumb" and derided her faith by nicknaming her "Grace."[31] Her repeated warnings about differential treatment and legal risk were ignored.[32] This is not normal collegiality; it is retaliation against the lone voice for equal access to a religious applicant. Defendant further claims that Plaintiffs' discussion of Grant's "Daniel in Babylon" admission is a "brazen mischaracterization." Def. Br., pp. 17-18. But it's not clear what the mischaracterization is. The testimony states: **Plaintiffs' Counsel:** And so your reference, you mentioned that you've told multiple people you felt like Daniel in Babylon. You felt like Daniel in Babylon specifically while you were working for Hermon School Department.  **Grant:** Yes.[33] Plaintiff does not dispute that Grant *also* referenced the Maine Department of Education in discussing this concept (although he did not work for that agency).

---

[28] Jnt. Ex. 6 at 58:56–1:05:39.

[29] Defendant further suggests that Keezer could have simply moved for a one-year rental use arrangement, while downplaying her evident confusion during the process. Def. Br., p. 7, n.5. This fact is immaterial as Plaintiffs don't claim that she had any discriminatory intent or motive. The record instead reflects that the entire process was disorganized and irregular.

[30] Plt. Ex. 5 at pp. 3, 9-10, 12; Tr. Vol. I 137:13-20, 138:19-24.

[31] Plt. Ex. 5 at p. 38; Tr. Vol. II 71:16-17.

[32] Plt. Ex. 5 at pp. 3, 5, 9-10.

[33] Tr. Vol. II, 157:11-17.

PLAINTIFFS' CLOSING ARGUMENT REPLY

Taken together, the record reflects exclusion and disparagement directed at people of faith, along with the disregard of warnings from the lone advocate for equal access, Keezer. Even Grant, who initially supported the Church, ultimately acquiesced to pressure from the Committee and Walsh. These circumstances support an inference that the decisions were driven by considerations beyond neutral administrative concerns.

## V. THE TRIAL EVIDENCE SATISFIES BOTH FEDERAL AND STATE STANDARDS

The governing framework is set forth in this Court's summary judgment order. ECF No. 51, Page ID#: 909–10, 920. Under *Scott-Harris* and *Walsh*, Plaintiffs have shown improper motive by a significant bloc (indeed, a majority) of decisionmakers (McLaughlin, Oiler, Shorey, and Keith) with additional circumstantial evidence of participation or acquiescence (Walsh and Grant). This record supports a reasonable inference that the challenged actions were driven by unconstitutional considerations, not neutral policy application. That inference is reinforced by *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, where the Supreme Court recognized that differential treatment of similarly situated objections can indicate hostility. 584 U.S. 617, 637–38 (2018).

Here, Plaintiffs were subjected to heightened procedural barriers, shifting rationales, and delays, while comparable secular requests were handled without similar scrutiny. This disparity supports the same conclusion: Defendant's justifications reflect not neutral administration, but impermissible consideration of religious identity.

## VI. CONCLUSION

Defendant's Closing Brief cannot reconcile the direct evidence of belief-based questioning, the disparate treatment, the pretextual concerns, the administrators' complicity, or the unfettered discretion. The Court should consider a simple but revealing counterfactual: If the same shifting rationales, post hoc concerns, and selective applications of policy were offered to justify denying access to a group on the basis of race, those explanations would not be viewed as neutral administrative judgments. They would be recognized for what they are. Plaintiffs respectfully request that the Court enter judgment in their favor, issue the requested declaratory and injunctive relief, award nominal damages, attorneys' fees, and grant any other relief the Court deems just and proper.

PLAINTIFFS' CLOSING ARGUMENT REPLY

Dated: April 23, 2026

/s/ Julianne Fleischer
Julianne Fleischer, Esq., Bar No. 337006
Advocates for Faith & Freedom
25026 Las Brisas Road
Murrieta, California 92562
Tel: (951) 600-2733
jfleischer@faith-freedom.com

/s/ Wenonah M. Wirick
Wenonah M. Wirick, Esq., Bar No. 9634
Conley & Wirick, P.A.
31 Union Street
Bath, Maine 04530
Tel: (207) 443-3434
wwirick@conleyandwirick.com