UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| THE PINES CHURCH and MATT GIOIA, | ) | |
| Plaintiffs | ) | |
| v. | ) | No. 1:23-cv-00214-LEW |
| HERMON SCHOOL DEPARTMENT, | ) | |
| Defendant | ) | |

## DECISION AND ORDER

Plaintiffs The Pines Church and its lead pastor, Matt Gioia, have brought this action against the Hermon School Department (Defendant) alleging violations of their First Amendment rights arising out of their efforts to secure long-term use of school facilities for church services. This matter is before the Court following a two-day bench trial on Plaintiffs' claims.

## FINDINGS OF FACT

Plaintiff Matt Gioia moved his family from Colorado to Maine in the summer of 2020 to start a new church. Gioia was born in Waterville, Maine, and lived in Guilford, Maine until he graduated high school and joined the military at seventeen years old. Initially, Gioia's church—The Pines Church—gathered at his home. In March of 2021, The Pines Church began holding Sunday morning services at a movie theater in Orono, Maine, pursuant to a month-to-month lease arrangement. As the Church grew, Gioia began to look for a new space that could accommodate a larger group. At a barbecue, Gioia

happened to meet Haily Keezer, a member of the Hermon School Committee, who suggested that Gioia should inquire about renting space at Hermon High School.

The Hermon School Department has policies and procedures that govern the availability of HSD facilities for community use. This policy provides that "[s]chool facilities should be made available for appropriate community use when such facilities are not required for their primary purposes: the instruction of students and related school activities." Joint Ex. 1 p. 1. The policy distinguishes between "occasional or short-term use of school facilities," which "shall be authorized by the school principal," and "long-term rental or lease," which "shall be authorized by the Hermon School Committee upon the recommendation of the Superintendent of Schools." *Id.* In 2022, the Superintendent of the Hermon School Department was Micah Grant.

Organizations could reserve facilities for occasional or short-term use by submitting a completed Building/Facilities Request Form (Joint Ex. 2) for approval by school administrators. Various organizations regularly used Hermon High School facilities with approval from the Principal or Superintendent. *See* Joint Ex. 7 (facilities-use request forms submitted by the Girl Scouts, Boy Scouts, Builders Club, Hermon Recreation (also referred to as "Hermon Rec"), and youth basketball).

The Hermon School Committee consisted of five voting members and a handful of nonvoting members, including two student representatives and the Superintendent[1] (ECF

[1] The Committee also included two representatives from RSU 87, because a certain number of RSU 87 students attended Hermon High School. These representatives were entitled to vote on educational matters before the Committee, but not on non-educational matters. The Pines Church lease proposal was not an educational matter.

No. 136 at 1). In the 2022-23 term, the voting members were the Committee Chair Jesse Keith, Vice Chair Karen Shorey, Stephanie Oiler, Haily Keezer, and Christopher McLaughlin[2] (*Id.* at 4). Committee Members serve on a volunteer basis. Some (but not all) are parents of children who currently attend, will attend, or have previously attended Hermon public schools. The Committee meets once per month, a few days ahead of which Committee Members receive packets that include the meeting's agenda, which is set by the Committee Chair and the Superintendent, and related materials. Members are generally not supposed to conduct or discuss Committee business outside of these monthly public meetings.

In August of 2022, Gioia reached out to the Hermon School Department. After a couple of phone calls to discuss the possibility of renting space at Hermon High School for a few hours on Sunday mornings, Gioia was told that the high school would not be able to accommodate the Church.[3] On Friday, September 23, 2022, Gioia emailed HSD Superintendent Micah Grant to renew his inquiries, mentioning that he had been informed that the high school lacked staffing to accommodate the Church's request, despite Gioia's

[2] The trial evidence in this case established that the Committee operated with a baseline level of dysfunction, and that interpersonal relationships between members were not consistently positive or productive. Haily Keezer's relationships with others on the Committee, for example, appears to have been fraught. Keezer and Plaintiffs attribute this to her identity as a conservative Christian. To what extent the tension between Keezer and the other members was driven by religious or political differences, as opposed to personality differences, I cannot say. Grant, for instance, testified to religious views that, at a glance, appear quite similar to those held by Keezer. Despite this, the two did not appear to have a good working relationship. That does not rule out the possibility that Keezer's claim is correct, particularly considering my ruling, but my ruling does not require it to be considered. In any event, I see the question of whether and to what extent Keezer was the victim of anti-Christian animus during her tenure as a committee member is only minimally relevant to the issues for decision in this case.

[3] Keezer testified that in September 2022, Gioia reached out to her after this first request was denied, and that she advised him to inquire why his request was denied. Trial Tr. Vol. I, 91:12-19 (ECF No. 147).

offer to compensate staff. *See* Plf. Ex. 6, pp. 4-5. Grant promptly replied and arranged to meet with Gioia the following Wednesday morning at Grant's office.[4] At that meeting, Gioia "shared the vision in [his] heart for the church in leasing the facility" with Grant and discussed what the Church would need and how it would use the space. Trial Tr. Vol. I 19:21-25 (ECF No. 147). Gioia recalled sharing with Grant that the Church would require a year-long lease, for Sunday mornings between 7:30 a.m. and 1:00 p.m. Gioia and the Church's members would bring their own equipment, which they would set up and take down themselves. Grant, a pastor himself, was enthusiastic about Gioia's proposal, and took Gioia to see some spaces at Hermon High School that he thought might suit the Church's needs. The next Monday, Gioia emailed Grant again to ask about arranging a walkthrough at the High School with two of his team members, which was ultimately scheduled for the morning of Wednesday, October 19, 2022. *See* Plf. Ex. 6, pp. 18-21.

After this walkthrough, Grant told Gioia that the next step in the process would be to submit a written proposal to the Hermon School Committee. Gioia prepared a written proposal and sent it to Grant by email on October 26, 2022. *See* Plf. Ex. 6, p. 17. In that

[4] The same day, Keezer also emailed Grant about the Church's request, copying two Hermon High School administrators (including Principal Brian Walsh), and blind-copying Committee Chair Jesse Keith. *See* Pl. Ex. 5, p. 5. In that email, she noted that an event was being hosted at the High School that upcoming Sunday, which she "assume[d] involves far more staff than using the gym for church." *Id.* This, Keezer testified, was a reference to a political fundraiser to be held in the school cafeteria. Trial Tr. Vol. I, 94:8-13 (ECF No. 147). She wrote, "Many schools are rented for this purpose," and pointed their attention to "policy 'AC' 'non-discrimination' . . . for reflection." Pl. Ex. 5, p. 5. She closed with the request that they "[p]lease reconsider the current determination, with how the school can meet the request, even if that means using a different building." *Id.* Keezer also testified that, later that day, she went to the Superintendent's Office to pick up her packet for the next School Committee meeting. Trial Tr. Vol. I, 97:2-13 (ECF No. 147). She recalled asking Grant if he had seen her email discussing Gioia's desire to lease space at the High School. *Id.* She recalled that Grant indicated that he had been in touch with Gioia and that he would look at her email and get back to her. *Id.*, 98:2-18.

email, Gioia provided some background about himself, his family, and the Church. *Id*. He explained that they "would like to pursue the option of leasing the theater, cafeteria, and two additional classrooms in the High School on Sunday mornings," from 7:30 a.m. to 1:00 p.m. *Id*. He added that although the Church had its own equipment, they would like to use the lighting system in the theater. *Id*. Finally, he requested an "opportunity to be able to meet with you [the Committee] in person to share our vision for the church and city of Hermon," and provided a link the Church's website and social media. *Id*. A few days later, Grant called Gioia and explained that the next step would be for Gioia to give an oral presentation to the Committee at their upcoming meeting. [5]

Gioia attended the Committee's November 7, 2022, meeting[6] and gave a presentation about the Church and its lease proposal. He noted that Maine is one of the safest states to raise children but also has one of the highest rates of opioid addiction and ranks 49th in Christians per capita out of the 50 states. Gioia envisioned a role for the Church in "redirecting that trajectory." Trial Tr. Vol. I 8:24-9:3 (ECF No. 147); Joint Ex. 5, 41:02-18. He told the Board that he wanted the Church to bring purpose to people's lives and "to help position marriages and families to flourish in this community." *Id.*, 42:23. He laid out the logistical details of the Church's proposal: a one-year lease of the theater,

---

[5] At trial, Grant testified that he and Jesse Keith, the School Committee Chair, made Gioia's request "a presentation item and not an actionable item" on the November meeting agenda, because Keith would be absent from that meeting. Trial Tr. Vol. II, 140:15-25 (ECF No. 148). Grant felt that it was "a good precedent to have the entire board present to vote on anything," but acknowledged that only a quorum was required for the Committee to take a vote. *Id.*

[6] The complete recording of the Committee's November 7, 2022 meeting, was admitted into evidence as Joint Ex. 5.

cafeteria, and a couple of classrooms, and would be willing to pay$1,000 a month. Finally, Gioia closed his presentation by "personally invit[ing] each and every single one of you along with your families to visit our church in Orono at Spotlight Cinema any Sunday to see firsthand what we are all about." *Id*., 43:23-37.

After Gioia finished his presentation, he walked away from the podium. Committee Member Haily Keezer asked if the Committee had any questions, and Grant asked Gioia to come back up to the podium. Keezer asked Gioia which spaces at the school the Church wanted to use. Gioia explained that they were interested in the theater, the cafeteria and a couple of adjacent classrooms. Grant chimed in with additional details. He had identified a classroom that would work for this purpose, explaining that leasing a classroom that was not in use would best protect the personal belongings and private information of students. And he added that the Church would not use the school's audio-visual equipment in the theater. Keezer then asked whether the Church would need staffing. Gioia responded that the Church would do its own set up and tear down—they would only need a way to enter the building. Grant added that they would charge the Church a spot-cleaning fee, like they did for the sports teams that used school facilities. Kristen Shorey, the Committee's Vice Chair, asked if the Church would need a space to store their equipment after they took it down. Gioia explained that they had a trailer, but if storage space was available that would be preferred. Committee Member Christopher McLaughlin asked Gioia whether The Pines Church was affiliated with any denomination. Gioia responded that the Church was nondenominational but had been launched through the Association of Related Churches (ARC). *Id*., 46:55-47:01. He told McLaughlin that he had a prospectus of the Church's

launch—"a guide of . . . what we accomplished over the last year"—that he would leave behind and invited McLaughlin to review the prospectus after the meeting "to find out a little bit more about us." *Id.*, 47:01-19.

Committee Member Stephanie Oiler then asked Grant if this was "a normal type of lease" for a public school system. *Id.*, 47:22-30. Grant responded that he did not know but pointed out that the Town of Hampden had a similar rental arrangement with the Rock Church and promised to investigate it over the next thirty days. Oiler acknowledged that athletics used school facilities on the weekends, but expressed concern that making classrooms available could compromise student privacy and that the school would continue to get more requests. Grant responded:

> Yeah, I think it's a very valid—this is the first one I've ever had and Gioia can attest, I think we met three times because I'm not going to put a request out there that's—I haven't vetted it, obviously. So to your point, looking at making sure our confidentiality… That's why all lease requests come to you, because ultimately you have to make that decision, when you—I can say yes to a sports team for a Saturday or five Saturdays, but when we talk about a year-long or there's significant money involved or there's significant space being used, that's a Board decision. After this and sports, we don't have a lot of space left, so as far as more requests, I doubt it.

*Id.*, 48:18-58. Grant then asked Brian Walsh, the High School Principal, if he'd ever seen a year-long lease request; Walsh answered that he had not. "Well, it feels good to be first," Gioia added, to laughter from the Committee. *Id.*, 49:19-22. A student representative asked if the lease would be limited to Sunday services only. Grant explained that it would be, but that the Church could also make one-time requests for other times, like any other sports team or Boy Scouts. The same student then asked whether the Church was interested in this space specifically because it was a school. Gioia explained that the Church's interest

in the school's space was informed by financial considerations and the Church's need to accommodate a greater number of people as it grew and assured that they desired to "dig roots" in the Hermon community. Finally, McLaughlin asked Gioia to confirm that this lease was instead of—not in addition to—the space the Church was already using in Orono, which Gioia confirmed was correct. Shorey confirmed that there were no further questions and thanked Gioia for his time. Approximately fifteen minutes elapsed from the beginning of Gioia's presentation to the conclusion of the Committee's questioning. At that meeting, Oiler was the only Committee Member to voice discomfort with the prospect of Grant granting the lease request on grounds I find specious in the light of the trial record. McLaughlin also asked Gioia to identify the Church's denominational affiliation, from which I find his bad motive is fairly inferred and later robustly confirmed by a series of questions he asked Gioia on a host of social and cultural issues.[7]

The next day, a former committee member emailed Keith and Shorey to share her belief "that it is not in our communities [sic] best interest to lease one of our school facilities to any religious organization," warning that "[t]here is a quiet movement in our country by some conservative religious groups who are actively working to soften the boundaries between church/state, starting with our schools" and that granting the Church a lease would lead to "a slippery slope." Plf. Ex. 5, p. 30. She wondered how the Hermon School Department would have to respond to a similar request from "an Imam who wants to open a mosque," in light of the "precedent" set by a lease to The Pines Church. *Id.*, p. 31. Her

[7] Gioia testified that he found the question "a little weird," and "didn't understand what relevance it held to us in seeking a lease," Tr. Vol. I, 29:3-13 (ECF No. 147), he offered to provide McLaughlin the Church's written prospectus.

email concluded with unintended irony: "There's a reason why the founding fathers wrote the constitution the way they did." *Id.* Keith and Shorey denied at trial that this email influenced their decision-making with respect to the Church's lease request, which I find implausible in light of the trial record. Trial Tr. Vol. II, 10:12-11:6, 53:2-4 (ECF No. 148).

Also on November 8, 2022, McLaughlin sent an email to The Pines Church's "info" email address, thanking Gioia for his presentation, explaining that he had some additional questions, and asking for Gioia's contact information. *See* Plf. Ex. 5, p. 7. Someone at the Church forwarded McLaughlin's email to Gioia, who responded to McLaughlin, asking that he funnel his questions through the Superintendent, Micah Grant. *Id.* McLaughlin responded that he would. *Id.* That very afternoon, McLaughlin reached out to Grant and explained that he "had a few additional questions" for Gioia:

> McLaughlin "wanted to get a better sense of how [T]he Pines Church approaches issues of diversity, equity, and inclusion around their messaging around some key issues relevant to marginalized communities." Plf. Ex. 6, p. 22. Those questions requested information about the Church's views on same-sex marriage, "[a]ccess to safe and affordable abortion," "[a]ccess to gender affirming medical care," "[c]onversion therapy for LGBTQIA+ individuals (youth and adults)," and "[i]nclusive sexual education and access to birth control for youth." *Id.*, p. 23.

McLaughlin also asked Grant if there was a School Committee policy in place for renting school spaces. *Id.* Grant responded that he would forward the questions to Gioia and he attached the policy for community use of school facilities that McLaughlin requested. *Id.*, p. 22.

On November 10, 2022, Grant emailed Gioia, explaining that he had "received an email from a committee member seeking the Church[]'s approach to a variety of diversity and equity issues" and asking if Gioia would "provide the church's views/stances where

applicable," which Grant proposed to "pass . . . back to that committee member." Plf. Ex. 6, p. 13. Grant provided those questions—apparently copied and pasted from McLaughlin's email—in an attachment. *See* Plf. Ex. 6, p. 15. Gioia asked Grant if other tenants were required to answer these questions. *Id.* p. 13. Grant responded that this was "the first long-term lease request the committee has entertained, so from that standpoint this has not been asked of other prospective tenants," and asked that Gioia let him "discuss this with our attorney and get back to you." *Id.* I surmise the answers to such questions would be a central concern to McLaughlin and other Committee Members regardless of the length of the lease request but I interpret Grant's response as a noble if ultimately unsuccessful effort to keep the School's evaluation of the Church's request within the navigational beacons of the Constitution and the related advice from its lawyer. Grant's response to Gioia's question seems narrowly true but incomplete and his desire to "discuss this with our attorney" seems like a sound and much more revealing response to Gioia's question about differential treatment between religious and secular users of public property.

Gioia did not hear back from Grant for more than two weeks. On November 28, 2022, Gioia sent an email referring to an attached letter. Plf. Ex. 6, p. 9. That letter "outline[d]" Gioia's "deep concerns and utter shock at the list of questions submitted to" him. *Id.* p. 11. "It is entirely inappropriate for a representative of the State (the school board) to ask a religious organization about their faith, morality, and political stances, when considering them for a lease or for any other matter," he wrote. *Id.* Gioia indicated that he had sought legal advice and had "been informed that [the Church's] request to ask for the

lease is entirely appropriate and violates no Federal Laws or the First Amendment," because "the school district had leased space in the past," and as a result was now "required to consider any request independently of religious beliefs and/or political affiliations." *Id*. He asked Grant to consult the School Department's counsel before sending additional emails, to keep the emails private and questions already sent, and "simply proceed with the normal approval process." *Id*. Gioia invited Grant's "verbal and in person response," anticipating that the School Department's counsel would likely advise against further written communication, and asked for guidance "as to our next steps in our efforts to secure the lease." *Id*.

Sometime after sending this email, Gioia received a phone call from Grant. Grant told Gioia that the questions should not have been sent, that it would not happen again, and that the Church would be judged fairly on the merits of its lease application—without regard to its beliefs. Following that conversation, Gioia understood that the next step in the process would take place at the December 12, 2022, School Committee meeting, where the Committee would decide on the Church's rental application.

In advance of that meeting, Grant and School Committee Chair Jesse Keith consulted Hermon School District's legal counsel. A legal memorandum from their legal counsel dated December 6, 2022, addressed to Keith, indicates that he asked for "a general overview for the Committee regarding what First Amendment implications exist" with respect to the Church's lease request, specifically:

1. Must the Committee deny the request on the grounds that permitting the Church to access school space constitutes an unlawful establishment of religion?

2. Would refusing to lease the space to the Church because the Church is a religious organization violate the Church's right to freely exercise its religion?

Def. Ex. 1, p. 1. As an initial matter, the memorandum observed that Policy KG "likely creates a designated public forum or a limited public forum, meaning that once the space is offered for public use, the Committee may not restrict that use to organizations based on their viewpoint." *Id.*, p. 1, n.1. The memorandum answered the first question with a decisive "no," explaining that "simply . . . permitting the Church to access [school] space" would not have "the effect of making students or members of the public feel obligated to engage in or accept a specific religious perspective." *Id.*, p. 2. With respect to the second question, the memorandum cautioned that denying the Church a lease because it is a religious organization likely would violate the Church's free exercise rights, reasoning that such a denial would need to be justified by a compelling state interest. *Id.* The memorandum also advised, however, that this analysis "does not mean that the Board *must* approve the Church's lease request," but rather "that it should apply the terms of the Policy using the same analysis and criteria that it would for any other, non-religious organization." *Id.*

At trial, neither Grant nor Keith was entirely certain which of them had requested the legal opinion, but both were aware of it before the December meeting.[8] The memorandum was shared with the other Committee Members before the meeting as well. Grant recalled "reach[ing] out" to an attorney for "guidance on how to approach that

[8] Both agreed that, as Superintendent and Chair, they were the two people who dealt with counsel on behalf of the School Department.

meeting and if there were any questions raised about renting to a religious organization," following his email exchange with Gioia. Trial Tr. Vol. II, 138:13-23 (ECF No. 148). Asked what he sought to gain from the memorandum, Grant explained that he "wanted them [the Committee Members] to have confidence that they were not establishing a religion and that they could say yes to Pastor Matt's request." *Id.*, 139:15-23. His "ultimate goal," he explained, "was to make sure [Gioia] got a yes or his church got a yes." *Id.*, 139:23-25. Grant, himself is a born-again Christian, testified that he sometimes felt like Daniel in Babylon while managing the school department because he believed his personal faith was misaligned with the Maine Department of Education. Trial Tr. Vol. II 155: 13-24, 157:11-17 (ECF No. 148).[9]

At the December meeting,[10] Keith started the discussion of the Church's lease application by noting that the Committee had heard a presentation at the previous month's meeting (which he had missed) and invited Grant to speak about it. Grant explained that the Church was looking for a year-long lease of the theater, the cafeteria, and a classroom for Sunday services. Grant explained that Gioia had "shared a vision" of how the Church would "impact the community," and that he had grown up in Guilford, Maine. Joint Ex. 6, 56:44-59. Grant also cautioned the Committee that they had "created a limited public forum," because of their short-term rental arrangements with other organizations, including

---

[9] While explaining his connection to Daniel in Babylon, Grant professed that "every person has to decide where their lines of morality are in what they tolerate versus what they walk away from. So that would be an example of a belief that I – – I have as a Christian that the Department of Education at that time in Maine d[id] not support." Trial Tr. Vol. II 157:4-9 (ECF No. 148).

[10] The complete recording of the Committee's December 12, 2022 meeting, was admitted into evidence as Joint Ex. 6.

the Scouts and youth sports. *Id*., 57:04-21. He explained the arrangement would involve a fee, somewhere between $750 and $1,000, as determined by school policy. He acknowledged that this was the first year-long lease request they had received and that it was up to the Committee to decide.

Committee members then began asking Grant questions, which Grant answered, occasionally looking to Gioia (who was seated in the audience) for confirmation that the information he provided was correct. Keith asked what time the Church would use the space. Grant explained that they had requested Sunday mornings, from 7:30 a.m. to 1:00 p.m., for a service that would be held from 10:00 to 11:00 a.m. He also volunteered that there would be clean-up afterwards, for which the Church would be charged a fee, like any other group that rents out the gymnasium. Oiler asked if the School Department would have to pay for staff to be present while the Church used the facility. Grant responded that the Church would pay for it. She asked if the Church would receive a key to the school building, or if they would have to be let in. Grant said they could get a key, but that would be worked out in the lease agreement. Oiler asked if school facilities were leased for shorter terms such as six months. Grant explained that he regularly approved block rentals, such as renting the gym to a basketball program for a certain number of Sundays over a certain number of months. Oiler asked if the Church would interfere with any preexisting agreement for use of the space. Grant responded that he would not have brought the proposal to the Committee if it did, but in the event school-related conflicts arose, school activities would take priority. Oiler then expressed concern over the building's capacity to accommodate a group of more than a hundred people and the number of parking spaces.

Grant explained that while some churchgoers may have to park further away, that the building itself could accommodate the Church's current numbers. Looking at Gioia, Grant said, "If it gets to a thousand people, we'll have to talk—which I hope you do." Joint Ex. 6, 1:02-27-30.

At this point, McLaughlin jumped in to ask if the goal of leasing to the Church was to generate revenue. Grant said it was not. McLaughlin then asked how the lease would serve the goals of the Committee. That was for the Committee to discuss, Grant responded, but he noted that Gioia and his family lived in Hermon and wanted their church to become part of the Hermon community and to support the Hermon community.

Shorey then turned the discussion in a more pragmatic direction, asking Grant about snow removal (which would continue to take place as usual) and liability insurance (which the Church would be required to obtain). After Grant answered those questions, definitively turning back all concerns, Oiler returned insistently to her question about the number of people being too overwhelming for a relatively large public high school facility, despite Grant having rejected this concern. She then asked if it would be possible to extend the Church a six-month lease. How this relates to the number of people parking on school property on a Sunday morning was not explicated by Oiler or anyone else. Grant responded, "The Committee can do any—just because there's a request, the Committee can say, we'd like to try this for six months or that we'd like to do a month-to-month and we want the Superintendent to follow up and make sure it's being cleaned . . . The Committee can determine the length, the request is just what the request was, and I'm sure that it's—that's for knowing that the rug's not going to get pulled out . . . ." *Id.* 1:05:50-

06:19. In other words, while the Church had requested a year-long lease, the term proposed by the Church was not binding on the Committee, which, in Grant's view, was free to approve whatever length of lease it thought best, presumably so long as those concerns were tethered to the Policy and reality and not pretext for concerns about leasing to a Church. Keith stated that he liked the idea of a six-month lease, reasoning that a year was a long time to commit the building to one particular group, but six months would be "a better test run . . . to make sure it's not impacting the kids," because "our priority is making sure that this facility is open for kids first and foremost." *Id.*, 1:06:18-07:02. This despite Grant's assurance that as between the business of the school and a tenant, should a conflict ever arise, which he ruled out as a possibility after his vetting, the tenant must yield to the demands of the school. Keezer then asked if Grant had any understanding with Gioia about the lease term, asking if he knew the Church's position on the six-month lease option and if not, whether Gioia could be included in the discussion. Grant clarified that there was no legal contract in place. Keith proposed having the Committee decide on a shortened lease term first, that the Church did not request, before having Grant discuss the proposal with Gioia.[11]

One of the student representatives asked Grant if the High School's address would appear on the Church's promotional materials, and when Grant responded that it would, whether this would cause "confusion or conflict in the community." Grant explained that the lease would likely include language disclaiming any endorsement of the Church. But

[11] At trial, Keith explained that members of the public were not usually called upon to speak at Committee Meetings unless the agenda specified that person would be presenting. *See* Trial Tr. Vol. I, 214:09-215:02 (ECF No. 147); Trial Tr. Vol. II, 26:19-23 (ECF No. 148).

appearing to interpret the student's question as referring to the Church's beliefs or religious mission, he cautioned, yet again:

> [T]his doesn't happen very often in Maine, but I think it's important to remember that just because it doesn't happen a lot, doesn't mean we haven't already created what's called a limited public forum and we do allow our space to be rented by other organizations who it doesn't mean we endorse or believe in the things that they do or stand for. So I think you're asking a great question and that would be something that we would put in our lease agreement, saying we are letting them use the space just like we would let any other organization use the space and it doesn't mean that we agree with their stances or their philosophy and their mission.

Joint Ex. 6, 1:09:39-10:24. Keith spoke next, reiterating that students had first priority to school facilities and asking Grant if he had run the lease proposal past the High School Principal, Brian Walsh. Grant said that he did not want to speak for Walsh, but he understood there were a couple of school-related conflicts, including a choir performance.

At this invitation, Walsh took the podium and explained that he had several reservations about the Church's request. He first explained that it would be difficult to find the staff to clean the building on Sunday afternoons. But apart from this, he continued:

> [W]e've never had a long-term lease, at least over my twenty-one years here, and I think there's a number of reasons we don't do that. There's a lot of variables we just don't know. No question our students should come first, our program should come first.
>
> We also don't know or have the sense of how this will be promoted, to [the student representative's] question. If you put Hermon High School's name with a church or another *organization with different beliefs than the school has, I see that as problematic*. But again, that's where I sit and that's where I stand. Doesn't mean this organization won't do a great job, doesn't mean they won't support, hopefully, our mission as well. I just don't know, there are too many variables with that and again we have not—we have never done that.
>
> What I would not want is for students to feel like a group organization that we are renting to, *their vision or their mission is now ours*. And there's a

> blurred line when it comes to that. I have nothing against this church, this reverend, or anything, we've just never said yes to something like this, so probably why it's in your hands, because you guys get to make that decision. I'm looking at the facility and some other variables, so that's kind of—that's where I come from.

*Id.*, 1:11:34-13:16 (emphasis added). Keith asked Walsh to expand on the staffing issues. Walsh explained that there had been problems getting custodial staff coverage for other after-hours and weekend events, like school dances and sports activities. Grant, in what I interpret as discomfort over the preceding questions and comments sounding in secular zeal and differential treatment of the Church because it's a church, offered a review and tutorial of the legal advice that the Committee had just received from its lawyer:

> I just want to be clear that there is no Establishment violation. So I understand what Walsh is saying, but you got the advice from our attorneys today, there is no Establishment violation, the Committee is not violating the Clause by allowing the Church . . . to use the space per policy. That's from Drummond Woodsum. So I just want to emphasize that there is no Establishment Clause violation . . . if we allow the Church to do this.
>
> And I think it's also important to recognize that we have to make sure that we're consistent in the way we apply our practice to other organizations, and we have continually opened our doors and created a limited public forum for other organizations to come in and use this space. So that's something that, unless you were willing to close those other things down, I think you have to take a serious look.
>
> Now, again, the term and the length, I think [are] all very good questions, *but you've obviously seen . . . the opinions from our attorneys, so I think you need to take those into consideration as well.*

*Id.*, 1:13:56-15:08 (emphasis added).

McLaughlin chose this moment to speak up, posing a question to Walsh about whether he had received any feedback from students about the Church's lease proposal. Walsh answered:

> Since you brought it up—I was not going to bring it up, but I will—I've had a number of students who've come down and asked the question, *why would we have that church in, what do you know about that church, are they going to use Hermon High School's name, what if we disagree with their mission*, et cetera. This is not illegal, and I—to Grant's point—I know it's not. It's that perception piece, and that's where we get that blurred line of, is Hermon High School—because again, I'm sure you could put language or craft language, and you should be careful with the lease and what you put in there, *but if Hermon High School's name is tied to it, it then becomes this blur*, especially for high school students, of is this a school-sponsored event, is this a school program, and so if the name's tied to it, it becomes an issue. And they've had questions that I've, I haven't said yes or no to them, I said it's in the hands of the Board, at where—where it probably should be.

*Id.*, 1:15:17-16:07 (emphasis added). McLaughlin asked if any students had given positive feedback and Walsh responded no, but that this kind of input would not be typical. Keezer offered her view that allowing the Church to name the High School as the location of its meetings did not amount to the High School advertising for the Church, any more so than any other political group that hosted and promoted events at the School. Walsh responded by positing that it would be acceptable for the Church to use the High School's street address in promotional materials, as opposed to identifying Hermon High School by name, clarifying, "I just don't want it looking like Hermon High School is sponsoring a church." *Id.*, 1:17:03-10.

At this point, Keith asked the Committee if there was any further discussion or if anyone was going to make a motion. Oiler repeated her concerns about the number of people who would be coming into the building for Church services. She asked Grant about the other organizations that rented school space, noting that students participated in the programming they provided—for example, youth basketball. Grant listed the groups he could remember: basketball, baseball, Hermon Rec, Girl Scouts, Boy Scouts. Keezer

pointed out that the Church was only looking to lease space for a few hours on Sundays, and that the service itself—when the most people would be present—would only last an hour. She also reiterated her concern that a six-month lease would not be long enough.

At this, Keith asked Keezer if she was making a motion. Keezer responded, "I'm discussing," and asked if there was a motion for six months that she had missed. 1:18:57-19:30. Shorey then made a motion to move forward with a six-month lease.[12] Keith asked for a second. No one—including Keezer—raised a hand. Keith announced that the motion failed. Oiler then made a motion for a month-to-month lease, citing concerns about the number of people and cleaning the space afterwards, which she was careful to emphasize had nothing to do with the organization. Keezer asked if they could ask Gioia about how the Church kept its current space clean. Oiler curiously protested that this was not about the Church (when in fact it was ostensibly about the Church and its janitorial readiness) but any organization, then adding the less than persuasive point that if fifteen people got the stomach bug at the same time, someone would have to clean it up.[13] Given the shortage of custodial staffing, she explained, she was concerned about the number of people who would be coming in and out of the building. She suggested that the Committee investigate its current rental arrangements, to make sure those organizations were paying what they should considering the costs associated with hosting them. What this had to do with the

[12] At trial, Shorey testified that she was not necessarily opposed to the idea of a year-long lease and that by motioning a six-month lease, she "was compromising." Trial Tr. Vol. II, 54:6-8 (ECF No. 148). At the same time, however, she acknowledged having some "[a]pprehension, when it had never been requested prior." *Id.* 55:1-5.

[13] At trial, Oiler testified that she had in mind a specific incident that occurred at Hermon Middle School when one of her children was a student there. Trial Tr. Vol. I, 186:8-11 (ECF No. 147).

Church's application remains a mystery.

Shorey then asked if her understanding was correct that a month-to-month lease would not require Board approval. Keith responded that they needed a second on Oiler's motion. After a brief pause, Keith seconded it himself. He explained that his concerns were about staffing and prioritizing the space for students and their activities, issues that Grant had flatly responded were not problematic. Keezer responded:

> I'm just thinking of the Constitution and limiting someone's right to rent a building and utilize it for church or worship. I have concerns about the legalities of not permitting someone to do that, because month-to-month, like she said, wouldn't need board approval and they're an established church who needs a facility with stability. You can't just uproot a hundred people and move it around on Sunday easily, that's inconsistent with the request.

*Id.*, 1:23:40-24:25. Once Keezer finished speaking, Keith asked if there was any further discussion, then announced that they would take a vote on the month-to-month lease. Keezer asked, "So it's my understanding we're here to vote on a year lease, which is what he originally said—so now you want to change it—change the . . ." *Id.*, 1:24:40-52. As Keezer trailed off, Keith explained that the motion was for a month-to-month offer and Shorey explained that her motion had died. It is not clear from these unusual proceedings just exactly how Keezer's motion had died or if there ever was a motion for the requested one-year lease. Keezer said, "No I mean, last time when he presented, it was for a year lease—so we're disregarding that vote, so you're changing the vote." 1:25:09-12. Keith responded that his understanding was that they did not vote at the last meeting. Keezer repeated, "I'm just trying to clarify—he brought forward a year lease and now you're changing it to make it a month to month." Grant explained that Gioia had requested a year, but that the length of the lease term was "at [the Committee's] discretion to decide."

1:25:22-2:35:41. Finally, Keith asked if there was any further discussion and called a vote on the motion. Keith, Shorey, Oiler, and Keezer voted in favor. Only McLaughlin voted against it.

The next day, Gioia spoke with Grant.[14] He recalls telling Grant that it was "hard . . . not to connect the dots" between declining to answer questions about the Church's beliefs and the decision to offer the Church a month-to-month lease, instead of the requested one-year lease. Trial Tr. Vol. I, 43:19-44:1 (ECF No. 147). He asked Grant to put the six-month option "back on the table," to give the Church the opportunity to show that they "will be good stewards of the space," "as a sign of good faith" from the School Department. *Id.*, 44:1-4. Grant then sent Gioia an email on January 5, 2023, in which Grant wrote:

> Per our conversation, I brought your request for a six-month lease of Hermon High School facilities to our committee chair for agenda consideration at the January school committee meeting . . . . Per our committee rules, items that have a motion and a vote must wait at least 90 days to be taken up again (I apologize as I did not realize this at the time of our conversation).
>
> I understand the logistical concerns you shared with me as it pertains to a month-to-month lease. However, this is very common with how we rent our space to other organizations. In addition, you would be working with me directly, in regard to the lease terms and renewal(s) which I believe would be logistically advantageous in the future.

Plf. Ex. 6, p. 24. Gioia rejected the month-to-month lease offer. And after ninety days passed, he did not renew his request for a six-month lease.

---

[14] Separately, that same day, Keezer also emailed Keith to express her disappointment that Gioia had been excluded from the Committee's discussion and her concern that the Church, as "a religious organization," had been treated differently from "'other' organizations," so as to potentially "make the district vulnerable to a lawsuit." Plf. Ex. 5, p. 3. Keith forwarded Keezer's email to Grant shortly after receiving it. *See id.*

## CONCLUSIONS OF LAW

Plaintiffs contend that Defendant's treatment of the Church's application for a one-year lease violated their rights under the First Amendment of the U.S. Constitution and Maine's public accommodations laws.

Before addressing those claims, however, I must provide background on the somewhat unusual procedural travel of this case. After I denied the parties' cross-motions for summary judgment (ECF No. 51) and ruled on their motions in limine (ECF No. 131), Plaintiffs moved to convert the upcoming trial from a jury trial to a bench trial by abandoning their claims for "compensatory damages beyond the nominal amount." Pl. Mot. to Convert Jury Trial to Bench Trial at 1 (ECF No. 132). Instead, Plaintiffs purported to seek "only permanent injunctive relief, declaratory relief, nominal damages in the amount of $1.00, and attorney's fees and costs." *Id.* The motion was Granted (ECF No. 134), and the matter was tried without a jury.

### A. First Amendment Claims

Plaintiffs contend that Defendant's actions with respect to the Church's lease application violate the First Amendment's guarantees of freedom of speech and the free exercise of religion, as well as its prohibition of "laws respecting an establishment of religion." U.S. Const. Amend. I. When a party claims that a local government entity—in this case, the Hermon School Department—has violated its federal constitutional rights, the vehicle through which the aggrieved party may pursue that claim is 42 U.S.C. § 1983.

The Free Speech Clause prohibits restrictions on access to limited or designated public fora that "discriminate against speech on the basis of viewpoint," including on the

basis that the viewpoint in question is a religious one. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106, 112 (2001). In other words, if a public school's facilities are available for public use, a religious organization cannot be denied access to those facilities because it is a religious organization. *Id.*; *see also Lamb's Chapel v. Cent. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 390-94 (1993); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 390-94 (1995). Similarly, the Free Exercise Clause "bars even 'subtle departures from neutrality' on matters of religion," *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018) (citation omitted), and therefore prohibits "denying a generally available benefit solely on account of religious identity," unless such denial is "justified . . . by a state interest 'of the highest order,'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017) (citation omitted). Finally, "the organizing principle of the Establishment Clause is 'government neutrality'—between 'religion and nonreligion,' as well as among religions." *Marrero-Mendez v. Calixto-Rodriguez*, 830 F.3d 38, 44 (1st Cir. 2016) (quoting *McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 860 (2005)).[15]

By virtue of Policy KG, the Hermon School Department made its facilities available "for appropriate community use when such facilities are not required for their primary

[15] Plaintiffs argue that "[t]he process and outcome reflect hostility to Plaintiffs' orthodox Christian beliefs, violating the Establishment Clause's prohibition on official preference against disfavored religions." Pl. Closing Br. at 19. But while the Establishment Clause "forbids an official purpose to disapprove of a particular religion or of religion in general," the Supreme Court has observed that its Establishment Clause cases "for the most part have addressed governmental efforts to *benefit* religion or particular religions." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993) (emphasis added). Where, as here, Plaintiffs "allege an attempt to disfavor their religion . . . the Free Exercise Clause is dispositive." *Id.*

purposes: the instruction of students and related school activities," including for "long-term rental or lease." Joint Ex. 1, p. 1. Having done so, the School Department could not then reject the Church's lease application because it is a religious organization or because of disagreement with its religious viewpoints, without violating the First Amendment, as Plaintiffs contend has occurred. Moreover, in its determination of the Church's lease request, the Committee was required "to proceed in a manner neutral toward and tolerant of . . . religious beliefs." *Masterpiece Cakeshop*, 584 U.S. at 638.

Plaintiffs contend that the Hermon School Department violated their First Amendment rights by (1) subjecting the Church to a lease application process different from that imposed on others seeking to use school facilities, and (2) denying the requested year-long lease with reference to the Church's religious viewpoint or out of animus against that viewpoint.

Plaintiffs' process-based contentions are somewhat perplexing. As I understand it, Plaintiffs argue that Superintendent Grant should have "provide[d] the standard Building/Facilities Request Form and . . . inform[ed] Plaintiffs of the ordinary administrative process for obtaining short-term approval," instead of "divert[ing] Plaintiffs into a more burdensome, highly scrutinized, and unprecedented process," and that as a result, he "did not act as a neutral administrator."[16] Pl. Closing Br. at 11. Plaintiffs make

[16] *See* Pl. Closing Br. at 14 ("Superintendent Grant and Principal Walsh . . . imposed atypical procedures, facilitated impermissible religious inquiry, amplified concerns about 'association' with the Church's beliefs, and steered the decision-making process toward a discriminatory outcome. Their actions provided the structure, justification, and momentum for the Committee's denial. When the administrators charged with ensuring neutrality instead enable and reinforce religious discrimination, the resulting decision cannot stand."). Plaintiffs also fault Grant for forwarding McLaughlin's questions to Gioia, for "refusing to correctly address" Gioia's request for a six-month lease after the December 2022 meeting, and for disregarding Keezer's concerns about the Church's treatment. *Id.* at 11-12.

similar arguments with respect to Principal Walsh.[17] *See id.* at 12-13.

I struggle to see any support in the record for Plaintiffs' attempt to build a case of animus toward religion based on "procedural irregularities." In terms of shepherding Plaintiff's application, the trial evidence showed that Superintendent Grant supported the Church's lease application. There is no evidence to suggest that Grant would have handled the request differently if the applicant was not a church. Moreover, I find that the record is replete with breathtaking examples of Grant acting as a guardrail on every occasion that the Committee started to drive the process into a constitutional bridge abutment. Even if Grant's shepherding of the Church's application ultimately contributed to the Committee's rejection of the requested year-long lease, I see no reason to believe that any of those procedural decisions could be characterized as a product of Grant's hostility to the Church or its views. I am convinced that, if anything, Grant's conduct as to procedure supported and favored treating the Church equally to all other potential public users of public space, a point he repeatedly made to the Committee in an effort to get them focused and in league with the Constitution and the advice given to them by their own lawyer. I also find that the limited involvement of Principal Walsh in any procedural matters would not warrant a different conclusion. Walsh was present for the Committee's hearing and offered remarks, discussed below, but he did not do anything untoward at least in relation to procedure.

In any event, Plaintiffs' claims for relief are limited by the identity of their chosen

[17] Specifically, Plaintiffs point to Walsh's decision to deny Gioia's initial request to use the High School's facilities for lack of staffing and his decision to inform Shorey of the Church's request prior to the Committee's meeting. *See id.* at 12-13.

Defendant: the Hermon School Department. "Under § 1983, municipalities can be liable for constitutional violations only if the violation occurs pursuant to an official policy or custom." *Welch v. Ciampa*, 542 F.3d 927, 941 (1st Cir. 2008) (citing *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978)). "A plaintiff can establish the existence of an official policy by showing that the alleged constitutional injury was caused by a formal decision of a municipal legislative body . . . or by a person with final policymaking authority." *Id.* (citations omitted). Alternatively, a plaintiff may rely upon a custom or practice "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell*, 436 U.S. at 691. Plaintiffs have not attempted to demonstrate that any of the actions Superintendent Grant or Principal Walsh took or failed to take with respect to the Church's lease application process amounted to a municipal policy or custom that would allow for a finding of liability against the Hermon School Department, nor does it appear to me that they could. *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403-05 (1997) (describing the plaintiff's burden to demonstrate that the prerequisites to municipal liability are satisfied); *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (issues "adverted to in a perfunctory manner" without "some effort at developed argumentation" are waived).

That leaves Plaintiffs' contentions with respect to the School Committee's decision to deny the Church a year-long lease or a six-month lease and offer a month-to-month lease instead. "A single decision by a municipal policy maker constitutes official policy 'only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'" *Freeman v. Town of Hudson*, 714 F.3d 29, 38 (1st Cir.

2013) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)). Whether a municipal actor has final policymaking authority on a given issue is a matter of state and local law. *See Walden v. City of Providence, R.I.*, 596 F.3d 38, 55-56 (1st Cir. 2010). Plaintiffs argue that by virtue of Policy KG, the Hermon School Committee is the final policymaker with respect to long-term lease arrangements, and as a result, the Committee's decision on the Church's lease application "constitutes official municipal policy." Pl. Closing Br. at 19. Defendant does not resist that contention, so I will not resist it, either. The question then becomes whether that decision was made because of the Church's religious identity or its religious beliefs, in violation of the First Amendment.

When a "constitutional deprivation is [not] apparent on the face of the ordinance or in the text of the challenged policy," and the Court must determine whether "the legislative body acted out of a constitutionally impermissible motive," the First Circuit has acknowledged the "perplexing problems of proof" that follow. *Scott-Harris v. City of Fall River*, 134 F.3d 427, 436, 438 (1st Cir. 1997), *rev'd on other grounds sub nom. Bogan v. Scott-Harris*, 523 U.S. 44 (1998). If a plaintiff cannot prove "bad motive on the part of a majority of the members of a legislative body," then "evidence of both (a) bad motive on the part of a significant block of legislators, and (b) circumstances suggesting the probable complicity of others," such as "evidence of procedural anomalies" or "evidence indicating that the legislators bowed to an impermissible community animus," may nonetheless suffice. *Id.* at 438. The court expressly eschewed any brightline rule, noting that the overall "key is likelihood." *Id.* I start with the question of whether a majority or significant block of committee members demonstrated bad motive.

I find without any difficulty that McLaughlin exhibited bad motive. McLaughlin's intrusive questions expressed viewpoint related concerns towards Plaintiffs, and he was the only member not to vote in favor of any lease term, including the month-to-month arrangement. Although his email itemizing political and cultural questions occurred early in the process, before the Committee received any advice from counsel, and even though he testified that he harbored no ill will toward Plaintiffs after gaining more information about them, it strikes me as very likely that McLaughlin lacked objectivity when it came to the question of leasing school space to the Church. It appears that he based his decision directly on the Plaintiffs' religious beliefs and its associated political and culture ethics that flow from those beliefs, and the religious nature of the proposed use. McLaughlin would have approached a lease request differently had it been presented by an organization that shared his personal beliefs.

I also find that Oiler was unable to overcome concerns over constitutionally permissible school-church association, notwithstanding the legal advice the Committee received, and Grant repeatedly emphasized. Though less openly hostile than McLaughlin, Oiler's attitude toward the Church was anything but neutral. Her question about whether the proposed lease to the Church was "normal" was, I find, directed to the propriety of renting to a church at all, rather than the lease term or any other permissible school-policy based concerns. This likely involved a motivation most accurately characterized as preventing Hermon High School from being associated with the Church's particular Christian beliefs. I conclude that this qualifies as a sufficient "bad motive" for First Amendment purposes as it has been interpreted and applied by the Supreme Court. I

recognize that Oiler raised a variety of practical considerations, and that the nature of the proposed use stands out insofar as it would involve a year-long lease commitment of the theater and cafeteria (and a couple of classrooms). But it struck me during her testimony, and I find, that Oiler's chief concern was that the tenant would be a Church. This was made only more obvious by protesting far too much that this was not about the Church but instead fear, for example, of mass vomiting epidemics and the platoon of janitorial assistance that would be required to mop it up. All of her other concerns about space and the like were definitively answered by Grant as not remotely problematic. I find based on the trial record that her motive was to avoid the School's association with the Church for its religious views. The First Amendment is designed to avoid discriminatory treatment of religious organizations in their enjoyment of the benefits of public facilities based on their religious beliefs or speech. *See Shurtleff v. City of Boston, Massachusetts*, 596 U.S. 243, 258 (2022); *see also Id.* at 261 ("[A] government *violates* the Constitution when (as here) it *excludes* religious persons, organizations, or speech because of religion from public programs, benefits, facilities, and the like.") (Kavanaugh, J., concurring).[18] For this reason, I find that Oiler, like McLaughlin, voted as she did based on "bad motive."

I find that Plaintiffs have proved that bad motive prevented Shorey from approaching the lease question fairly. Shorey, at her deposition, suggested that she believed McLaughlin's culture war email was appropriate, even though she later sought to characterize it as inappropriate at trial. It may be that Shorey believes that a School

[18] Citing *Espinoza* v. *Montana Dept. of Revenue*, 591 U. S. —— (2020); *Good News Club v. Milford Central School*, 533 U.S. 98 (2001); *McDaniel v. Paty*, 435 U.S. 618 (1978).

Committee should have the discretion to question any organization about how its values align with what she sees as the school community's values, to the extent a school community has its own conflicting body of values that can be reduced to a catechesis – perhaps it does. But support for a process that involves examining a prospective tenant's views on religious issues, simply because the prospective tenant is a church, tends rather starkly to highlight the questioner's lack of neutrality toward religion. Shorey's move of the Committee to vote on a six-month lease does little to undermine my findings. The fact that she was in league with McLaughlin's culture war email and later spoke critically of the Plaintiffs' litigation in text messages with McLaughlin suggests to me that she was more or less aligned with McLaughlin and shared his perspective on the matter.

Although I find that a majority of voting members exhibited bad motive which would itself be sufficient to end the inquiry, my findings should be considered also in context of the discussion during the deliberative process, which included rather openly anti-religious organization sentiment expressed by Walsh at least as he served as a voice of the school community and the discomfort it might experience especially if the beliefs of the School, whatever those might be, and the Church were at loggerheads. Even if the record had not established a majority of voting members acting out of bad motive, it would still have constituted a significant bloc of legislators and "circumstances suggesting the probable complicity of others," as well as "evidence indicating that the legislators bowed to an impermissible community animus." Recall that Walsh passed along student concerns about the Church *qua* church using the School and when asked if any spoke supportively of the idea, Walsh reported that none had. Also recall the email received by Keith Shorey

from a former committee member. That former member insisted that this was all a Trojan horse coordinated by conservative Christian groups to blur the line between school and religion. What would the Committee do, the former committee member queried, if an Imam were to set up shop at Hermon High School next?

The standard is one of likelihood, and on that basis, I find that at least three of the five decision makers acted under the influence of bad motive and in so doing violated the Plaintiffs' rights under the First Amendment. The members "concerns" were threadbare and definitively dispelled by Grant. Despite Grant's urging to reflect upon its lawyer's legal advice at each successive close call and eventual collision with the First Amendment, the Committee simply reiterated pretextual reasons to reject the Church's request that were not legitimate in the light of all of the evidence and even if they had been marginally legitimate, the decision was clearly and substantially tainted with anti-Church motives. This finding was made only more obvious by members' final, prophylactic professions that this had nothing to do with the Church. I find that to be remarkably unpersuasive.

My finding that the majority of the Committee's members who voted acted with bad motive is sufficient to sustain Plaintiffs' claims. Still, I will speak to a couple of additional findings that support "evidence of procedural anomalies." The Plaintiffs insist that the remaining voting members evidenced their bad motives by failing to move the year-long lease for consideration. Making a motion to take up a proposal is not an expression of support for the proposal. It is only a maneuver to elicit a second motion and a vote, to give the applicant process. I find it curious that the Committee was unwilling to treat the application before it on its own terms, to move for a vote and if seconded, to take a vote,

before moving on behalf of alternatives, without any discussion to reasonably rationalize such a parliamentary move. For its part, Defendant points to the majority vote in favor of a month-to-month use arrangement as proof of the lack of bias on the part of its committee members. I agree with the Church that this was not persuasive evidence of a lack of bad motive but to the contrary, is evidence of bad motive. The Committee knew the Church required a more fixed arrangement before uprooting itself from its then current location than a month-to-month arrangement provides. This appears to me to have been an offer designed to be rejected not one born of wholesome support for the Free Exercise Clause. Moreover, such informal arrangements do not even require the Committee's approval. Given these realities, the gesture appeared to be orchestrated for appearance purposes just as protestations that this had nothing to do with the Church when the overwhelming evidence demonstrates precisely the opposite to be true. As the First Circuit notes, discriminatory animus is "insidious" and a "clever pretext can be hard to unmask." *Scott-Harris*, 134 F.3d at 438.

There are certainly facts in this record that toe the line between apprehension toward the Church itself and legitimate concerns about complications that arise with a new type of use for a school. But novelty is not a basis to discriminate against religious organizations and whatever novelty this situation presented to the Committee was demystified by the sound legal advice its lawyers provided to the Committee before its discussion and decision. It was also pointed out that nearby Hampden Schools had a similar arrangement with the Rock Church, should the Committee have, on the grounds of novelty, wished to satisfy their curiosity as to how other schools had handled, apparently successfully, similar

arrangements.

Concerns about a long-term lease request and staffing shortages, disassociated from my findings of fact presented here may plausibly appear like valid concerns best left to the Committee's discretion, so long as that discretion, as its lawyers capably pointed out, were tethered to the school policy. However, the undertones and overtones of bad motive unabated throughout the decision-making process transcend the publicly professed concerns by Defendant about lack of experience leasing the school for similarly-sized, long-term use, space constraints, foot traffic, and the displacement of student organizations, all of which were dispelled in any event. *See Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3d 65, 86 (1st Cir. 2004) ("[M]ere recitation of viewpoint-neutral rationales . . . does not immunize those decisions from scrutiny. The recitation of viewpoint-neutral grounds may be a mere pretext for an invidious motive.") (citing *Cornelius v. NAACP Legal Defense and Educ. Fund,* 473 U.S. 788, 811–13 (1985)). For these reasons, I find it more likely than not that discriminatory animus toward the Church motivated the Hermon School Department to decline the Church's request for a year-long lease and to instead vote to extend it a six-month lease.

**B. Maine Law Claims**

The Maine Human Rights Act ("MHRA") makes it is unlawful to deny public accommodations based on religion. 5 M.R.S. § 4592. The Hermon School Department is correct that the MHRA generally tracks federal anti-discrimination statutes, and that it is appropriate to look to federal precedent for guidance on such issues. However, when interpreting the MHRA, courts must independently decide issues of purely state law.

*Dussault v. RRE Coach Lantern Holdings, LLC*, 2014 ME 8, ¶ 27, 86 A.3d 52, 62-63 (citation omitted).

In Maine discrimination cases, courts generally assess whether the protected characteristic was a motivating or substantial factor in the challenged action, rather than requiring strict but-for causation. *Walsh v. Town of Millinocket*, 2011 ME 99, ¶ 31, 28 A.3d 610, 618 (one member's animus can taint the body's action if it was a motivating factor or a substantial cause for adverse employment action); *Wells v. Franklin Broad. Corp.*, 403 A.2d 771, 773 (Me. 1979) (inquiry is whether age was a substantial factor in employee's dismissal).

For the same reasons in the First Amendment discussion, I find that the Church's status was a substantial factor in the Committee's decision not to lease to the Church for their requested lease term, in violation of the MHRA.

**C. Relief**

By way of relief, Plaintiffs request an injunction of "the unconstitutional policy of Defendant that denied a six-month and one-year rental use arrangement to Plaintiffs."[19] Pl. Closing Br. at 20. Plaintiffs offer nothing by way of argument to justify this request and Defendant's closing brief does not comment on the propriety of injunctive relief. I am left

---

[19] This request is hardly a model of precision and, without more, I am left to wonder what "policy" Plaintiffs seek to enjoin. I assume this is a reference to Policy KG, although in theory Plaintiffs could also be referring to the Committee's decision with respect to the Church's lease request, which is considered "an official policy" for purposes of municipal liability under 42 U.S.C. § 1983. *Welch v. Ciampra*, 542 F.3d 927, 941 (1st Cir. 2008); *see also Freeman v. Town of Hudson*, 714 F.3d 29, 38 (1st Cir. 2013); *Walden v. City of Providence, R.I.*, 596 F.3d 38 55-56 (1st Cir. 2010). If the latter, I do not see how the Committee's decision denying the requested year-long lease is one that could be "enjoined"—if this was Plaintiffs' way of asking for injunctive relief in the form of the denied lease, it certainly could have been made more clearly. If the former, Plaintiffs have offered nothing approaching a showing that Policy KG is unconstitutional on its face or otherwise illegal, so as to necessitate a permanent bar on its future operation.

with no arguments on the risk of irreparable harm, balance of equities, and the impact on public interest. Additionally, without a clear understanding of the unconstitutional "policy" the Plaintiffs refer to, I cannot sufficiently weigh these factors myself.[20]

Plaintiffs also request a declaratory judgment that the denial of their rental use request violated the First Amendment and Maine law, and nominal damages for said denial. *Id.* Here, Plaintiff has demonstrated that their request for a year-long lease term was denied, at least in part, because of their status as a church. Their request for a declaratory judgment is GRANTED and the violation of their rights will be declared in the conclusion of this Decision and Order.

Under federal law, if a plaintiff prevails in a lawsuit against the government that vindicates constitutional rights, the plaintiff is entitled to reasonable attorney fees as part of the costs. 42 U.S.C. § 1988(b). *Sullivan v. City of Augusta*, 625 F. Supp.2d 28, 30 (D. Me. 2009). Here, Plaintiffs are entitled to nominal damages and reasonable attorney's fees.

Under Maine state law, Plaintiffs are typically required to file a complaint with the Maine Human Rights Commission prior to the filing of the complaint in this Court in order to receive damages or attorney's fees under MHRA. *Gordan v. Cummings*, 2000 ME 68, ¶ 11, 756 A.2d 942, 944-945; M.R.S.A. § 4622. However, when an MHRA claim is attached to an additional claim that does not require administrative exhaustion such as a First Amendment claim, a plaintiff may recover damages and attorney fees without having filed a timely complaint. *See Dudley v. Hannaford Bros. Co.*, 190 F. Supp. 2d 69, 77 (D. Me.

---

[20] In the First Amendment context once it is found that Plaintiffs are likely to succeed on the merits, irreparable injury is usually presumed. *See Smith v. Trump*, 791 F. Supp. 3d 90, 99 (D. Me. 2025).

2002), *aff'd*, 333 F.3d 299 (1st Cir. 2003). Thus, Plaintiffs are entitled to attorney's fees and nominal damages under the MHRA as well as under the First Amendment.

**CONCLUSION**

Defendant's treatment and denial of the Church's application for a year-long lease violated the Plaintiffs' rights under the First Amendment of the United States Constitution and Maine's public accommodations law. Plaintiffs' request for injunctive relief is DENIED. Plaintiffs are awarded nominal damages in the amount of One Dollar ($1.00) and reasonable costs. Plaintiffs may submit their claim for costs and attorney's fees in accordance with Local Rules 54.2 and 54.3.

SO ORDERED.

Dated this 13th day of November, 2026.

/S/ Lance E. Walker
Chief U.S. District Judge